**UNITED STATES v. LIBBY, McNEIL & LIBBY.**

No. 6445–A.

District Court, Alaska.

First Division, Juneau.

Oct. 7, 1952.

See also, D.C., 98 F.Supp. 601.

---

698

P. J. Gilmore, Jr., U. S. Atty., Edward A. Merdes, Asst. U. S. Atty., Juneau, Alaska, for plaintiff.

W. C. Arnold, Seattle, Wash., R. E. Robertson, Juneau, Alaska, for defendant.

FOLTA, District Judge.

Plaintiff seeks to enjoin the defendant from continuing to operate its salmon trap on a site within the boundaries of the Hydaburg Indian Reservation in Alaska, and also to recover damages.

The reservation, comprising land and navigable waters of the Pacific Ocean, was established by an order of the Secretary of the Interior of November 30, 1949, 14 F.R. 7318, pursuant to Section 2 of the Act of May 1, 1936, 49 Stat. 1250, 48 U.S.C.A. § 358a. This suit was commenced May 3, 1951.

The defendant has operated the trap on the site in controversy since 1927 under a War Department license, a special use permit of the U. S. Forest Service and upon a full compliance with all statutory requirements. It contends that the reservation is invalid because:

(1) The Secretary did not comply with the Administrative Procedure Act, Title 5 U.S.C.A. § 1001 et seq., or with Depart-

mental procedure as published in 43 C.F.R. 50.152, 2 F.R. 6737.

(2) The order had not received the prior approval of the Director of the Bureau of the Budget, the Attorney General and the Secretary of Agriculture, as required by Executive Order 9337, U. S. Code Cong. Service 1943, p. 539, 8 F.R. 5516, 3 C.F.R. Cum.Supp. 1774.

(3) The Secretary included within the reservation lands which were under the jurisdiction of the Secretary of Agriculture, and hence were not public lands.

(4) The Order contravenes the Act of Congress of May 14, 1898, 30 Stat. 409, 48 U.S.C.A. § 411, declaring that the navigable waters and tide lands of Alaska shall be held in trust for the future state.

(5) The Order includes land and water which had not been reserved prior to May 1, 1936, for the use and occupancy of Indians and Eskimos by the Acts of Congress of May 17, 1884 or March 3, 1891, or previously reserved and placed under the jurisdiction of the Department of the Interior by any executive order and also includes additional lands which are neither adjacent to any reserved area, nor in the actual occupation of Indians and Eskimos.

(6) There was no occupancy or use of the reservation area by Indians or Eskimos since May 17, 1884, continuously to the time of the establishment of the reservation.

(7) So far as the navigable waters are concerned, the order infringes on the public and common right of fishery and navigation and the right of fishery guaranteed by the White Act, 43 Stat. 464, as amended, 48 U.S.C.A. § 221 et seq.

(8) The Order cannot be upheld under the power conferred upon the President under the Act of June 25, 1910, 36 Stat. 847, 43 U.S.C.A. §§ 141–143 and delegated to the Secretary, because such power was not exercised in conformity with Executive Order 9337, supra, and, moreover, is prohibited by the Act of June 30, 1919, 41 Stat. 34, 43 U.S.C.A. § 150.

The foregoing are only the principal grounds urged by the defendant in support of its contention.

At least since the discovery of gold in the Klondike, Congress has encouraged the settlement and development of Alaska and since World War II the importance of increased population to national defense has been stressed repeatedly in Congress, in military circles and by administration spokesmen. In the ensuing 54 years the Indians of Southeastern Alaska, and particularly the Haidas, have not only abandoned their primitive ways and adopted the ways of civilized life but are now fully capable of competing with the whites in every field of endeavor. Undoubtedly in the early days their rights were encroached upon and violated, for which perhaps no compensation would have been adequate. Now, long after their assimilation in Southeastern Alaska is an accomplished fact an attempt is made to compensate not those who suffered under the impact of civilization, but their remote descendants, and this would be done at the expense of the whites who followed and had nothing to do with the exploitation of the Indians. It is a matter of common knowledge that today the Indians of Southeastern Alaska prefer the white man's life despite all its evils and shortcomings.

Viewing this controversy in historical perspective it is no exaggeration to say that nothing since the purchase of Alaska has engendered so much ill-feeling and resentment as the Department's reservation policy and its encouragement of aboriginal claims, especially in the face of Miller v. United States, 9 Cir., 159 F.2d 997, holding that aboriginal title was extinguished by the Treaty of Cession. Whatever may be said in justification of reservations in the unsettled regions of Alaska, they are viewed as indefensible in Southeastern Alaska, and generally condemned by whites and Indians alike as racial segregation and discrimination in their worst form. So far as the relations between the whites and Indians are concerned, racial discrimination is virtually non-existent, and equality only awaits the emancipation of the Indian from wardship restrictions. Indians and Eskimos are found side by side in every walk of life, even in the legislative halls of the Territory

which would be beyond their reach without the votes of whites.

It now appears that the historic role of the white man is about to be reversed, for the facts of this controversy disclose a scheme reminiscent of white exploitation. The defendant has a valuable trap site 12 miles from the village of Hydaburg which is coveted by the Indians or their guardian. Its acquisition is accomplished by the device of a reservation. The Indians gain but add to their fetters, and the Department increases its sphere of influence.

█ Admittedly a trap site is not property in a legal sense, but by long established custom it has been given some of the attributes of property. It is recognized as such in the industry and freely sold, leased and transferred. No one jumps a trap site because experience has shown that such a practice leads only to retaliatory jumping and expensive litigation, with resulting uncertainty and chaos. For 27 years the plaintiff has expressly permitted the defendant to occupy the trap site in controversy for the purpose of supplying its cannery with salmon and the defendant asserts that the trap is an integral part of the plant, without which the operation is unprofitable. Now a right heretofore looked upon as amounting almost to a vested right is threatened by the reservation policy of the Department of the Interior.

In this instance it was proved that the reservation was created despite the assurance given to the defendant by the Department that no withdrawal of the land would be made in that area without notice to it and others concerned and an opportunity to be heard in opposition thereto, in conformity with the Departmental procedure, as published in 14 F.R. 7084.

Obviously, therefore, there is more to this litigation than meets the eye. Those who are opposed to reservations predict that if this attempt succeeds, Alaska will be a checkerboard of reservations, the location of which will be determined solely by proximity to trap sites, from which all whites who have not acquired a vested right will be evicted and all prospectors, trappers, hunters and fishermen thereafter excluded. Once the implications of the reservation policy are perceived and the plaintiff's case viewed in the light thereof, it is not one that could appeal to the conscience of a court of equity. Indeed, there is grave doubt whether the plaintiff comes into court with clean hands. But in view of the conclusions I have reached on the merits, I shall refrain from discussing the applicability of that doctrine.

The Act referred to authorizes the Secretary to designate as an Indian Reservation:

(1) "Any area of land which has been reserved for the use and occupancy of Indians or Eskimos by section 8 of the Act of May 17, 1884 (23 Stat. 26), or by section 14 or section 15 of the Act of March 3, 1891 (26 Stat. 1101)".

(2) "Or which has been heretofore reserved under any executive order and placed under the jurisdiction of the Department of the Interior or any bureau thereof".

The Act also authorizes the inclusion of additional public lands adjacent to such areas or any other public lands in the actual occupation of Indians or Eskimos.

Section 8 of the Act of May 17, 1884, 23 Stat. 26, 48 U.S.C.A. § 356 note, providing a civil form of government for Alaska is as follows:

"That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress".

So far as the Act of May 3, 1891, 26 Stat. 1101, is concerned, only Section 14 thereof is pertinent here. It merely prohibits the disposition of any part of the public domain under Section 12 as trade or manufacturing sites to which the natives of Alaska have prior rights by virtue of actual occupation.

█ Although the plaintiff leans heavily on the presumption of validity to uphold the order of the Secretary, it introduced evidence in its case in chief to prove use

or occupancy of the area. The evidence failed utterly to establish either use or occupancy except of minute individual tracts and as to those, not only was continuity not shown but it clearly appears that they were abandoned.

The explanation of this failure is a simple one. The evidence necessary to establish use or occupancy since May 17, 1884, is not available because of lapse of time, communal tenure, lack of continuity of use or possession abondonment, and the profound changes in the mode of life of the Haidas after the turn of the century, with corresponding changes in the uses made of their lands. Necessarily much of the evidence consisted of Haida traditions—the accuracy of which seems to vary inversely as the square of their remoteness in time and space from the events which they describe. Undoubtedly it was this deficiency in the proof that left the plaintiff no alternative but to fall back on aboriginal title, requiring less proof, as was done in United States v. 10.95 Acres of Land, D.C., 75 F.Supp. 841, or urge upon the Court the view that aboriginal title should be assimilated to possessory title based on actual use or occupancy.

This shift, of course, would be unavailing so long as the barrier of Miller v. United States, supra, remained, so this Court is asked to simply ignore it. Not only is that case imperative authority, but there is no conflict of opinion among the circuits, and it is not perceived how such a conflict could arise since the question of the existence of aboriginal title in Alaska could hardly be litigated in any other circuit. The attempt to circumvent that decision indicates more than a mere lack of respect for the doctrine of stare decisis. It is a confession that the defendant's evidence has not only rebutted the presumption of validity, but has conclusively established the non-existence of any of the factual bases prerequisite to the establishment of a valid reservation under the Act of May 1, 1936, 48 U.S.C.A. § 358a.

■ But the conclusive answer to the suggestion that binding precedent be ignored and that the plaintiff be relieved of producing any more evidence than that re-quired to support a claim of aboriginal title is that the statute under which the order is sought to be upheld and the decisions thereunder clearly require a showing of actual use or occupancy sufficient to support a possessory title. Russian American Packing Company v. United States, 199 U.S. 570, 26 S.Ct. 157, 50 L.Ed. 314; 44 L.D. 441, 444; U. S. v. Lynch, 8 Alaska 135, 13 L.D. 120; United States v. 10.95 Acres of Land, D.C., 75 F.Supp. 841–844 and the authorities there cited.

Applying this test, I find that the evidence introduced on behalf of the defendant conclusively shows that there has been no continuous use or occupation of the reservation area from May 17, 1884 to the date of the establishment of the reservation. Use and occupancy of small individual tracts were shown but in all cases it was proved that they had been abondoned. Fairly illustrative is the testimony given by James Taylor, that in March, 1900, he and Hal Gould covered Sukkwan Island, on which defendant's trap is located, as census enumerators, and that at that time there were only one white man, his Tlinget wife and another woman living on the entire island which is about the size of Manhattan Island. This in conjunction with the uncontradicted testimony that the Haidas were then residing at Howkan and Klinkwan shows how flimsy any claim of continuous use or occupancy is and furnishes support for the charge that the consideration which induced the creation of the reservation was not the preservation of rights acquired by actual use and occupation by the Haidas, but the acquisition of defendant's trap site. Be that as it may, the fact that the Haidas lived at Howkan and Klinkwan and did not abandon those villages until after Hydaburg was established in 1912 is sufficient by itself to negative continuity of use or occupancy.

■ It follows as a corollary, therefore, that since there was no area reserved by the Act of May 17, 1884, there was nothing to which any adjacent lands or lands in the actual occupation of Indians and Eskimos, could be added under the last clause of the first sentence of Section 2 of the Act of May 1, 1936, 48 U.S.C.A. § 358a.

Turning now to a consideration of the question whether the land embraced in the reservation consists of land which had previously been reserved under any executive order and placed under the jurisdiction of the Department of the Interior, together with additional public lands adjacent thereto or in the actual occupancy of Indians or Eskimos, it is noted that the plaintiff contends that the entry of the Hydaburg Townsite, comprising 189 acres, under the Act of March 3, 1891, 26 Stat. 1099, 48 U.S.C.A. § 355, is such a reservation and placement thereof under the jurisdiction of the Department of the Interior and that the additional area, although more than 500 times the area of the townsite, is nevertheless adjacent to the townsite or in the actual occupation of Indians or Eskimos.

The contention of the defendant is that the entry of the townsite is not such a reservation thereof and that such a vast area cannot be held to be "adjacent" thereto so as to justify its inclusion within the reservation and, moreover, that since it was shown that such land was not in the actual occupancy of Indians and Eskimos, it cannot be included within the reservation under that provision of the Act.

■ The first inquiry under this contention is whether the grant of a patent to the townsite of Hydaburg, in trust for the inhabitants thereof under the provisions of the law governing the entry of townsites, 43 U.S.C.A. § 718, is a reservation within the purview of the Act of May 1, 1936. It is significant that the Act contemplates a prior reservation under an *executive order*, title to which presumably would be held in trust for the Indians as a community, whereas under the townsite law the right of each inhabitant to a conveyance becomes vested upon entry of the townsite and the entry is made without the interposition of any executive order. It is not perceived, therefore, how such a townsite could become a reservation under the jurisdiction of the Department of the Interior. The argument that although such an alleged reservation comprises only 189 acres, nevertheless an area of 100,811 acres approximately one half of which lies across Sukkwan Strait, can be added to it as "ad-

jacent" land, is not only without color of precedent but the conclusion to which it leads is a demonstration of its fallacy. Thus under such a construction, the whole of Southeastern Alaska would be "adjacent", and could be added in the near future, to the Hydaburg reservation, particularly in view of the fact that the claims of aboriginal title are not limited to the area here under discussion or to Southeastern Alaska but embrace the entire Territory. In circus parlance, the sideshow would swallow the main tent.

I am, therefore, of the opinion that the Hydaburg townsite is not a reservation and that the vast area added to it was not "adjacent" within the intent of the Act of May 1, 1936.

■ I am also of the opinion that the lands under discussion were not public lands. Cf. Shannon v. United States, 9 Cir., 160 F. 870, 873; United States v. McIntire, 9 Cir., 101 F.2d 650, 654; United States v. State of Minnesota, 270 U.S. 181, 206, 46 S.Ct. 298, 70 L.Ed. 539. It is inconceivable that land included in a national forest and placed under the jurisdiction of the Secretary of Agriculture could thereafter be disposed of by the Secretary of the Interior as though it were a part of the public domain under his jurisdiction. It may be conceded that such lands are public in the sense that they are administered for the benefit of the public, but any diversion to such use as is here attempted, involving the usurpation of, or encroachment upon, the jurisdiction of another department, would not only nullify the purpose for which the land was included in a national forest, but lead to interdepartmental conflict which Executive Order 9337 was undoubtedly intended to obviate. Further support for this view as to procedure may be found in United States v. Schaub, D.C., 103 F.Supp. 873, 874. Moreover, it is worthy of note that the Act of May 1, 1936 uses the term "land", in describing areas reserved for Indians or Eskimos under the statutes referred to, and "public land" in describing what may be added to such reserved areas. Since land already reserved is no longer public land, it is clear that these terms were used with

discrimination, and that additions could not be made to such area except of public lands.

■ Having found that none of the factual bases for the reservation order existed, as required under the Act of May 1, 1936, the only question remaining to be disposed of is whether the reservation may be upheld under the delegation to the Secretary of the Interior of the Presidential power to withdraw areas from the public domain under the Act of June 25, 1910, 36 Stat. 847, 43 U.S.C.A. §§ 141–143.

Until the trial the plaintiff relied solely on the Act of May 1, 1936 to uphold the reservation order. But since then it relies also on the Act of June 25, 1910, conferring general power to withdraw public lands upon the President, which power has been delegated to the Secretary of the Interior. But it appears that the exercise of this power must be in conformity with Executive Order 9337, 8 F.R. 5516, 3 C.F.R.Cum.Supp. 1774, which requires the prior approval of the Director of the Bureau of the Budget, the Attorney General and the Secretary of Agriculture. The plaintiff admits that such approval was not obtained. Since the lands dealt with had been placed under the jurisdiction of the Secretary of Agriculture, it would appear that the Act of the Secretary of the Interior falls within the express provisions of the order. This in itself would appear sufficient to dispose of this contention. But this is not all. The Act of June 30, 1919, 41 Stat. 34, 43 U.S.C.A. § 150, expressly prohibits the withdrawal of public lands for or as an Indian reservation except by Act of Congress. It is my opinion, therefore, that the authority to designate an Indian reservation cannot be derived from the Act of June 25, 1910.

The plaintiff admits that it did not comply with Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., but contends that the Act is not applicable.

■ It would appear that the establishment of the reservation partook more of the nature of an adjudication, resulting in an order, rather than the formulation of a rule. Since no statute requires that a hearing be held, it cannot be said that Section 1004, Title 5 U.S.C.A., of itself required the giving of notice to interested parties before the Secretary took steps to establish this reservation. However, the Constitution itself requires that an agency observe the essentials of due process in proceedings not comprehended by, or beyond the scope of, the Administrative Procedure Act. Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616; Riss & Company v. United States, D.C., 96 F.Supp. 452, reversed, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345.

The signing of the order creating the reservation by Secretary Krug on the last day of his incumbency, in disregard of the procedure prescribed by the Administrative Procedure Act as well as that of his own department, and in violation of the promise made to the defendant that no reservation would be created in the Hydaburg area without notice to the defendant and an opportunity to be heard, becomes especially significant when projected against the background of this controversy.

5 U.S.C.A. § 1002 requires the Secretary to publish in the Federal Register certain specified information. The published procedure in effect at the time of the creation of the reservation is found in 14 F.R. 7048. The Plaintiff contends that the permissive language found therein allowed the Secretary to disregard the provisions concerning notice and hearing. In matters affecting the rights of the public such an arbitrary position is not in accord with the spirit and purpose of the Administrative Procedure Act, 1946 U. S. Code Congressional Service, p. 1205. The circumstances surrounding the promulgation of this reservation order were the antithesis of the traditional procedure contemplated by Congress in its consideration and enactment of the Administrative Procedure Act. I conclude, therefore, that the Administrative Procedure Act was applicable.

In view of the foregoing, I am of the opinion that the reservation was not validly created.