## ORGANIZED VILLAGE OF KAKE ET AL. v. EGAN, GOVERNOR OF ALASKA.

No. 3. Argued December 14, 1961.—Decided March 5, 1962.

*John W. Cragun* argued the cause for appellants. With him on the briefs was *Frances L. Horn.*

*Ralph E. Moody,* Attorney General of Alaska, and, by special leave of Court *pro hac vice, Avrum M. Gross,* Assistant Attorney General, argued the cause and filed briefs for appellee.

*Oscar H. Davis,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Cox* and *Roger P. Marquis.*

Mr. Justice Frankfurter delivered the opinion of the Court.

This is a companion case to No. 2, *Metlakatla Indian Community* v. *Egan, ante,* p. 45, but calls for separate treatment. Appellants seek the reversal of a decision of the Supreme Court of Alaska, —— Alaska ——, 362 P. 2d 901, affirming the dismissal of their petitions for injunctions against interference with their operation of fish traps in southeastern Alaska.

The Organized Village of Kake and the Angoon Community Association are corporations chartered under the Wheeler-Howard Act of 1934, 48 Stat. 984, 988, as amended, 49 Stat. 1250 (1936), 25 U. S. C. §§ 473a, 476, 477. Kake is located on Kupreanof Island, 100 miles south of Juneau. Angoon is located on Admiralty Island, 60 miles south of Juneau. They are occupied by Thlinget or Tlinget Indians, native to Alaska.

Both communities are entirely dependent upon salmon fishing. In pursuance of a policy to create a sound fishing economy for the two groups, the United States purchased canneries and related properties for Angoon in 1948 and for Kake in 1950. Since these dates appellants have operated fish traps at specified locations in nearby waters, under permits granted by the Army Engineers to erect traps in navigable waters and by the United States Forest Service to anchor them in the Tongass National Forest. In March 1959 the Secretary of the Interior, by regulations issued under authority of the White Act, 43 Stat. 464, as amended, 48 U. S. C. §§ 221–228, and the Alaska Statehood Act, 72 Stat. 339, permitted Angoon to operate three fish traps during the 1959 season and Kake four. 24 Fed. Reg. 2053, 2069. The following year the Secretary authorized permanent operation of these trapsites and specified one additional site for Angoon and five

more for Kake for possible future authorization. 25 CFR (1961 Supp.) pt. 88.

The history of this litigation is recited in *Metlakatla Indian Community* v. *Egan, supra*. It is sufficient to note here that Alaska in 1959 threatened to enforce against Kake and Angoon her anti-fish-trap conservation law, Alaska Laws 1959, c. 17, as amended by *id.*, c. 95; that the State seized one fish trap at Kake, arrested the President of the Kake Village Council and the foreman of the crew attempting to moor the trap, and filed informations against them; that suit was filed by both Kake and Angoon in the interim United States District Court for Alaska to enjoin this interference with their claimed fishing rights; and that the dismissal of both complaints was affirmed by the Supreme Court of Alaska.

The situation here differs from that of the Metlakatlans in that neither Kake nor Angoon has been provided with a reservation and in that there is no statutory authority under which the Secretary of the Interior might permit either to operate fish traps contrary to state law. Appellants do not rely heavily on the Secretary's regulations. Neither the White Act nor the Statehood Act, cited by the Secretary, supports a grant of immunity from state law. The White Act was a conservation and anti-monopoly measure. It authorized the Secretary to limit fishing times, places, and equipment in order to conserve fish but forbade him in so doing to create exclusive rights, even in Indians. *Hynes* v. *Grimes Packing Co.*, 337 U. S. 86, 122–123. Because the rights claimed are exclusive in the Kakes and Angoons, they cannot have been created pursuant to the White Act, even though that statute now applies, if at all, only to Indians. Moreover, the White Act gives the Secretary power only to limit fishing, not to grant rights. The Statehood Act retained "absolute jurisdiction and control" of Indian

"property (including fishing rights)" in the United States, but it did not give powers of the nature claimed to the Secretary of the Interior. No other source of authority appears available. The provisions now found in 25 U. S. C. §§ 2 and 9, referring to the President's power to prescribe regulations for effectuating statutes "relating to Indian affairs," to settle accounts of "Indian affairs," and concerning "the management of all Indian affairs and of all matters arising out of Indian relations," derive from statutes of 1832 and 1834, 4 Stat. 564 and 4 Stat. 735, 738. In keeping with the policy of almost total tribal self-government prevailing when these statutes were passed, see pp. 71–72, *infra,* the Interior Department itself is of the opinion that the sole authority conferred by the first of these is that to implement specific laws, and by the second that over relations between the United States and the Indians—not a general power to make rules governing Indian conduct. United States Department of the Interior, Federal Indian Law (1958), pp. 54–55; Cohen, Handbook of Federal Indian Law (1945), p. 102. We agree that they do not support the fish-trap regulations.

Both communities operate their traps under permits granted by the Army Corps of Engineers and by the United States Forest Service. But neither of these permits grants a right to be free of state regulation or prohibition. Like a certification by the Interstate Commerce Commission, each is simply acknowledgment that the activity does not violate federal law, and not an exemption from state licensing or police power requirements. Cf. *Maurer* v. *Hamilton,* 309 U. S. 598; *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177. The Engineers have no objection under the Rivers and Harbors Act, 30 Stat. 1121, 1151, 33 U. S. C. § 403, to the obstruction of navigable streams incident to the operation of fish traps at Kake and Angoon; the Forest Service has

no objection to the use of National Forest land to anchor them. Neither attempted to exempt these traps from state law.

As in the companion case, certain grounds relied on by the Alaska court are no longer urged by the State. The principal dispute now concerns the meaning of § 4 of the Statehood Act, in which the State disclaimed all right and title to and the United States retained "absolute jurisdiction and control" over, *inter alia,* "any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives."

The United States in its brief *amicus curiae* contended that the reservation of absolute jurisdiction over Indian "property (including fishing rights)" ousted the State from any regulation of fishing by Indians in Alaska. Appellants urge that Congress intended to protect the Indians in their freedom to continue fishing as they had done before statehood, so that Alaska cannot interfere with the Indian fishing actually practiced at that time. They argue in addition that in using fish traps they were exercising an aboriginal right to fish that was protected by § 4. The court below concluded that aboriginal rights of Alaskan natives have been extinguished, that appellants have no rights not enjoyed in common with all other Alaskans, and that § 4 protects only exclusive rights given Indians by federal law.

The United States wisely abandoned its position that Alaska has disclaimed the power to legislate with respect to any fishing activities of Indians in the State. Legislative history reveals no such intention in Congress, which was concerned with the protection of certain Indian claims in existence at the time of statehood. See, *e. g.,* Hearings Before House Committee on Interior and Insular Affairs on H. R. 2535 and related bills, 84th Cong., 1st Sess.

124–131, 266–267, 381–383 (1955). But we cannot accept Alaska's contention that Indian "property (including fishing rights)" refers only to property owned by or held for Indians under provisions of federal law. Section 4 must be construed in light of the circumstances of its formulation and enactment. See *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 87. Congress was aware that few such rights existed in Alaska. Its concern was to preserve the status quo with respect to aboriginal and possessory Indian claims, so that statehood would neither extinguish them nor recognize them as compensable. See, *e. g.,* House Hearings, *supra,* 130, 384 (1955) (Delegate Bartlett); Hearings Before Senate Committee on Interior and Insular Affairs on S. 50, 83d Cong., 2d Sess. 227 (Senator Jackson), 260–261 (1954).[1]

Discussion during hearings on the 1955 House bill affords further evidence that claims not based on federal law are included. Section 205 of that bill (like § 6 of the bill as enacted) authorized Alaska to select large tracts of United States land for transfer to state ownership. It was understood that the disclaimer provision left the State free to choose Indian "property" if it desired, but that such a taking would leave unimpaired the Indians' right

---

[1] In 1948 a statehood bill requiring disclaimer of "all lands . . . owned or held by any . . . natives, the right or title to which shall have been acquired through or from the United States or any prior sovereignty," was favorably reported with this explanation:

"As proposed to be amended, this paragraph would preserve all existing valid native property rights in Alaska, including those derived from use or occupancy, together with all existing authority of the Congress to provide for the determination, perfection or relinquishment of native property rights in Alaska. It would neither add to nor subtract from such rights and such authority, but would simply maintain the status quo." H. R. Rep. No. 1731, 80th Cong., 2d Sess. 15 (1948).

To the same effect, see H. R. Rep. No. 255, 81st Cong., 1st Sess. 13 (1949).

to sue the United States for any compensation that might later be established to be due. See House Hearings, *supra,* 135 (1955) (Delegate Bartlett). Feeling that experience had shown this procedure too slow to give prompt relief to the Indians, Oklahoma's Representative Edmondson proposed to exempt Indian property from the State's selection. *Id.,* at 381. This was rejected as virtually destroying Alaska's right to select lands. For, although Representative Edmondson pointed out that the disclaimer extended only to property owned by Indians or held in trust for them, four representatives clearly stated their belief that the disclaimer included not just the few Alaska reservations but also the aboriginal or other unproved claims in dispute, which covered most if not all of Alaska. *Id.,* at 383 (Representatives Engle, Dawson, Metcalf, Westland).

"Fishing rights" first appeared in a Senate bill reported in 1951, S. Rep. No. 315, 82d Cong., 1st Sess. 2. Earlier bills had mentioned only land. The fishing-rights provision is unique to Alaska, although the disclaimer is in other respects the same as in earlier statutes. See pp. 67–68, *infra.* It was included because fishing rights are of vital importance to Indians in Alaska. House Hearings, *supra,* 125 (1955) (Delegate Bartlett). The existence of aboriginal fishing rights was affirmed by the Interior Department's Solicitor in 1942, 57 I. D. 461. There was almost no discussion of "fishing rights" in Congress. In earlier hearings the Senate Committee was considering a suggestion by Senator Cordon that all Indian property be granted to the State, reserving the right to seek federal compensation, except for property actually occupied by Indians. Asked to describe Indian possessory rights, Governor Heintzleman portrayed a smokehouse beside a stream, 50 miles from the town where they live, visited for fishing purposes perhaps two weeks each year. Senate Hearings, *supra,* 137 (1954).

On a similar basis the Kakes and the Angoons have fished at the disputed locations since 1948 and 1950. It appears to be Alaskan custom that, although traps are taken from the water and replaced each year, one does not "jump" a trap-site. The prior claim of the first trapper is respected. See *United States* v. *Libby, McNeil & Libby,* 14 Alaska 37, 42, 107 F. Supp. 697, 700 (D. Alaska 1952); Gruening, The State of Alaska (1954), p. 171; 57 I. D. 461, 462 (1942). The Statehood Act by no means makes any claim of appellants to fishing rights compensable against the United States; neither does it extinguish such claims. The disclaimer was intended to preserve unimpaired the right of any Indian claimant to assert his claim, whether based on federal law, aboriginal right or simply occupancy, against the Government. Appellants' claims are "property (including fishing rights)" within § 4.

Because § 4 of the Statehood Act provides that Indian "property (including fishing rights)" shall not only be disclaimed by the State as a proprietary matter but also "shall be and remain under the absolute jurisdiction and control of the United States," the parties have proceeded on the assumption that if Kake and Angoon are found to possess "fishing rights" within the meaning of this section the State cannot apply her law. Consequently argument has centered upon whether appellants have any such "rights."

The assumption is erroneous. Although the reference to fishing rights is unique, the retention of "absolute" federal jurisdiction over Indian lands adopts the formula of nine prior statehood Acts. Indian lands in Arizona remained "under the absolute jurisdiction and control" of the United States, 36 Stat. 557, 569; yet in *Williams* v. *Lee,* 358 U. S. 217, 220, 223, we declared that the test of whether a state law could be applied on Indian

reservations there was whether the application of that law would interfere with reservation self-government. The identical language appears in Montana's admission Act, 25 Stat. 676, 677, yet in *Draper* v. *United States,* 164 U. S. 240, the Court held that a non-Indian who was accused of murdering another non-Indian on a Montana reservation could be prosecuted only in the state courts. The Montana statute applies also to North Dakota, South Dakota, and Washington. Identical provisions are found in the Acts admitting New Mexico (36 Stat. 557, 558–559) and Utah (28 Stat. 107, 108), and in the Constitutions of Idaho (1890, Art. 21, § 19) and Wyoming (1890, Art. 21, § 26), which were ratified by Congress (26 Stat. 215 (Idaho); 26 Stat. 222 (Wyoming)).

*Draper* and *Williams* indicate that "absolute" federal jurisdiction is not invariably exclusive jurisdiction. The momentum of substantially identical past admission legislation touching Indians carries the settled meaning governing the jurisdiction of States over Indian property to the Alaska Statehood Act in light of its legislative history.

Section 4 of the Statehood Act contains three provisions relating to Indian property. The State must disclaim right and title to such property; the United States retains "absolute jurisdiction and control" over it; the State may not tax it. On the urging of the Interior Department that Alaska be dealt with as had other States, these provisions replaced an earlier section granting to the State all lands not actually possessed and used by the United States. Hearings Before a Subcommittee of the House Committee on Public Lands on H. R. 206 and H. R. 1808, 80th Cong., 1st Sess. 2, 12, 14 (1947). The first and third provisions have nothing to do with this case; the second does not exclude state conservation laws from appellants' fish traps.

The disclaimer of right and title by the State was a disclaimer of proprietary rather than governmental interest. It was determined, after some debate, to be the best way of ensuring that statehood would neither extinguish nor establish claims by Indians against the United States. If lands subject to the claim of Indian rights were transferred to the State, the Indians were not thereby to lose the right to make claims against the United States for damages. See Senate Hearings, *supra,* 286 (1954).

The provision for "absolute jurisdiction and control" received little attention in Congress. In the 1954 Senate hearings the Committee was considering a provision copied from the Oklahoma statute that Indian lands should remain "subject to the jurisdiction, disposal, and control of the United States." Mr. Barney, on behalf of the Justice Department, urged the inclusion of such a provision in order to avoid the possibility that, under *United States* v. *McBratney,* 104 U. S. 621, federal criminal jurisdiction over Indian reservations might be extinguished by statehood. Senators Barrett and Jackson thereupon expressed the clear desire that federal jurisdiction not be made exclusive over all disclaimed areas. Mr. Barney denied that the provision would deprive the State of "political jurisdiction" over disclaimed properties. Senator Cordon declared:

> "The State may well waive its claim to any right or title to the lands and still have all of its political or police power with respect to the actions of people on those lands, as long as that does not affect the title to the land."

Senator Jackson said: "All that you are doing here is a disclaimer of proprietary interest," and Mr. Barney agreed. Senator Cordon said:

> "The act of admission gives to the State of Alaska political jurisdiction, including all that is meant by

the term 'police power,' within its boundaries unless there be express or definitely implied, which is the same thing, a reservation of exclusive jurisdiction in the United States."

Senators Barrett and Jackson and Mr. Barney agreed. Mr. Slaughter of the Interior Department pointed out that a later section of the bill, now § 11, provided for "exclusive" federal jurisdiction over Mt. McKinley National Park. Mr. Barney, in answer to a direct question, stated that "jurisdiction" in the Oklahoma statute and in his proposal for Indian property did not mean exclusive jurisdiction. Senate Hearings, *supra*, 283–287 (1954). The bill as reported contained no provision on jurisdiction but only a disclaimer of right and title, a reservation of federal power to extinguish Indian claims as if there had been no statehood Act, and an exemption from state taxation. *Id.*, at 331. Provisions retaining federal "jurisdiction" and "absolute jurisdiction" were considered interchangeable by at least one committee, which reported the disclaimer in an Alaska bill as "almost identical" with those in the preceding 13 admission Acts. S. Rep. No. 315, 82d Cong., 1st Sess. 15 (1951).

Most statehood bills contained the more common phrasing "absolute jurisdiction and control" rather than the Oklahoma phrase. Although this was the usual language employed to retain federal power in statehood acts, the Senate Committee in 1958 out of an abundance of caution deleted the word "jurisdiction" in order that no one might construe the statute as abolishing state power entirely. The Committee declared that it was not its intention by the retention of federal control to make the Alaska situation any different from that prevailing in other States as to state jurisdiction over Indian lands. S. Rep. No. 1163, 85th Cong., 1st Sess. 15 (1957). The House bill, which retained the usual language, was passed

first, 104 Cong. Rec. 9756, and the Senate made no amendments to the House bill because it feared that statehood might be lost once again if the House had to act on a conference report. 104 Cong. Rec. 12009–12010. Senator Jackson stated that "the differences are of wording and language rather than policy . . . designed to define more clearly some of the jurisdictional problems involved . . . . The objective of both bills is identical. There is strong evidence that the end product of both bills would be identical." The Senate amendment was designed simply to make clear what an examination of past statutes and decisions makes clear also: that the words "absolute jurisdiction and control" are not intended to oust the State completely from regulation of Indian "property (including fishing rights)." "Absolute" in § 4 carried the gloss of its predecessor statutes, meaning undiminished, not exclusive. Cf. *Boston Sand & Gravel Co.* v. *United States,* 278 U. S. 41, 47–48. The power of Alaska over Indians, except as granted by Congress in 1958, 72 Stat. 545, is the same as that of many other States.

The relation between the Indians and the States has by no means remained constant since the days of John Marshall. In the early years, as the white man pressed against Indians in the eastern part of the continent, it was the policy of the United States to isolate the tribes on territories of their own beyond the Mississippi, where they were quite free to govern themselves. The 1828 treaty with the Cherokee Nation, 7 Stat. 311, guaranteed the Indians their lands would never be subjected to the jurisdiction of any State or Territory. Even the Federal Government itself asserted its power over these reservations only to punish crimes committed by or against non-Indians. 1 Stat. 469, 470; 2 Stat. 139. See 18 U. S. C. § 1152.

As the United States spread westward, it became evident that there was no place where the Indians could be forever isolated.  In recognition of this fact the United States began to consider the Indians less as foreign nations and more as a part of our country.  In 1871 the power to make treaties with Indian tribes was abolished, 16 Stat. 544, 566, 25 U. S. C. § 71.  In 1887 Congress passed the General Allotment Act, 24 Stat. 388, as amended, 25 U. S. C. §§ 331–358, authorizing the division of reservation land among individual Indians with a view toward their eventual assimilation into our society.  In 1885, departing from the decision in *Ex parte Crow Dog,* 109 U. S. 556, Congress intruded upon reservation self-government to extend federal criminal law over several specified crimes committed by one Indian against another on Indian land, 23 Stat. 362, 385, as amended, 18 U. S. C. § 1153; *United States* v. *Kagama,* 118 U. S. 375.  Other offenses remained matters for the tribe, *United States* v. *Quiver,* 241 U. S. 602.

The general notion drawn from Chief Justice Marshall's opinion in *Worcester* v. *Georgia,* 6 Pet. 515, 561; *The Kansas Indians,* 5 Wall. 737, 755–757; and *The New York Indians,* 5 Wall. 761, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations.  By 1880 the Court no longer viewed reservations as distinct nations.  On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law, *Utah & Northern R. Co.* v. *Fisher,* 116 U. S. 28, 31.  In *Langford* v. *Monteith,* 102 U. S. 145, the Court held that process might be served within a reservation for a suit in territorial court between two non-Indians.  In *United States* v. *McBratney,* 104 U. S. 621, and *Draper* v. *United States,* 164 U. S. 240, the

Court held that murder of one non-Indian by another on a reservation was a matter for state law.[2]

The policy of assimilation was reversed abruptly in 1934. A great many allottees of reservation lands had sold them and disposed of the proceeds. Further allotments were prohibited in order to safeguard remaining Indian properties. The Secretary of the Interior was authorized to create new reservations and to add lands to existing ones. Tribes were permitted to become chartered federal corporations with powers to manage their affairs, and to organize and adopt constitutions for their own self-government. 48 Stat. 984, 986, 987, 988. These provisions were soon extended to Alaska, 49 Stat. 1250.

Concurrently the influence of state law increased rather than decreased. As the result of a report making unfavorable comparisons between Indian Service activities and those of the States, Congress in 1929 authorized the States to enforce sanitation and quarantine laws on Indian reservations, to make inspections for health and educational purposes, and to enforce compulsory school attendance. 45 Stat. 1185, as amended, 25 U. S. C. § 231. See Meriam, Problem of Indian Administration (1928); H. R. Rep. No. 2135, 70th Cong., 2d Sess. (1929); Cohen, Handbook of Federal Indian Law (1945), p. 83; United States Department of the Interior, Federal Indian Law (1958), pp. 126–127. In 1934 Congress authorized the Secretary of the Interior to enter into contracts with States for the extension of educational, medical, agricultural, and welfare assistance to reservations, 48 Stat. 596, 25 U. S. C. § 452. During the 1940's several States were permitted to assert criminal jurisdiction, and sometimes civil jurisdiction as

---

[2] *Fisher* permitted a territorial tax on a railway through Indian country, and one basis for the holding was that here discussed. The alternative ground was that the railway right-of-way had been withdrawn from the reservation, as was held in *Maricopa & Phoenix R. Co.* v. *Arizona Territory*, 156 U. S. 347.

well, over certain Indian reservations. *E. g.,* 62 Stat. 1161; 62 Stat. 1224; 64 Stat. 845; 63 Stat. 705. A new shift in policy toward termination of federal responsibility and assimilation of reservation Indians resulted in the abolition of several reservations during the 1950's. *E. g.,* 68 Stat. 250 (Menominees); 68 Stat. 718 (Klamaths).

In 1953 Congress granted to several States full civil and criminal jurisdiction over Indian reservations, consenting to the assumption of such jurisdiction by any additional States making adequate provision for this in the future. 67 Stat. 588, 18 U. S. C. § 1162, 28 U. S. C. § 1360. Alaska was added to the list of such States in 1958, 72 Stat. 545. This statute disclaims the intention to permit States to interfere with federally granted fishing privileges or uses of property. Finally, the sale of liquor on reservations has been permitted subject to state law, on consent of the tribe itself. 67 Stat. 586, 18 U. S. C. § 1161. Thus Congress has to a substantial degree opened the doors of reservations to state laws, in marked contrast to what prevailed in the time of Chief Justice Marshall.

Decisions of this Court are few as to the power of the States when not granted Congressional authority to regulate matters affecting Indians. In *Thomas* v. *Gay,* 169 U. S. 264, an Oklahoma territorial tax on the cattle of non-Indian lessees of reservation land was upheld on the authority of the *Fisher* and *Maricopa* decisions, *supra,* which permitted taxation of railroad rights-of-way. The Court conceded that because the lands on which the taxed cattle grazed were leased from Indians the tax might, in contrast to the railroad cases, have an indirect effect on Indians, but that effect was declared to be too remote to require a contrary result. In the latest decision, *Williams* v. *Lee,* 358 U. S. 217, we held that Arizona had no jurisdiction over a civil action brought by a non-Indian against an Indian for the price of goods sold the latter on the Navajo Reservation. The applicability

of state law, we there said, depends upon "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them," 358 U. S., at 220. Another recent statement of the governing principle was made in a decision reaffirming the authority of a State to punish crimes committed by non-Indians against non-Indians on reservations: "[I]n the absence of a limiting treaty obligation or Congressional enactment each state had a right to exercise jurisdiction over Indian reservations within its boundaries," *New York ex rel. Ray* v. *Martin,* 326 U. S. 496, 499.

These decisions indicate that even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law. Congress has gone even further with respect to Alaska reservations, 72 Stat. 545, 18 U. S. C. § 1162, 28 U. S. C. § 1360. State authority over Indians is yet more extensive over activities, such as in this case, not on any reservation. It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country. See Cohen, Indian Rights and the Federal Courts, 24 Minn. L. Rev. 145, 153 (1940), citing *Pablo* v. *People,* 23 Colo. 134, 46 P. 636. Even where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation, *Ward* v. *Race Horse,* 163 U. S. 504; *Tulee* v. *Washington,* 315 U. S. 681, in contrast to holdings by state and federal courts that Washington could not apply the laws enforced in *Tulee* to fishing within a reservation, *Pioneer Packing Co.* v. *Winslow,* 159 Wash. 655, 294 P. 557; *Moore* v. *United States,* 157 F. 2d 760, 765 (C. A. 9th Cir.). See *State* v. *Cooney,* 77 Minn. 518, 80 N. W. 696.

True, in *Tulee* the right conferred was to fish in common with others, while appellants here claim exclusive rights. But state regulation of off-reservation fishing

certainly does not impinge on treaty-protected reservation self-government, the factor found decisive in *Williams* v. *Lee*. Nor have appellants any fishing rights derived from federal laws. This Court has never held that States lack power to regulate the exercise of aboriginal Indian rights, such as claimed here, or of those based on occupancy. Because of the migratory habits of salmon, fish traps at Kake and Angoon are no merely local matter.

Congress has neither authorized the use of fish traps at Kake and Angoon nor empowered the Secretary of the Interior to do so. The judgment of the Supreme Court of Alaska is affirmed. However, in view of all the circumstances and in order to avoid hardship, the stay granted by MR. JUSTICE BRENNAN, and continued by the Court, will remain in force until the end of the 1962 salmon fishing season, as defined in the regulations issued by the Secretary of the Interior. *It is so ordered.*

MR. JUSTICE DOUGLAS, while joining the opinion of the Court, dissents from an extension of the stay for reasons to be stated in an opinion.

MR. JUSTICE DOUGLAS.*

When the decision in this case was announced on March 5, 1962, I noted that while I joined the opinion of the Court, I dissented from the continuation of the stay and would elaborate my views at a later time. As the decision to extend the stay was reached in Conference on March 2, 1962, there was insufficient time to prepare an opinion by the following Monday.

The stay was first granted by MR. JUSTICE BRENNAN, 80 Sup. Ct. 33, to maintain the status quo while this litigation was pending. The stay was then plainly justified, as the questions presented were substantial ones. Now,

---

*[This opinion was filed March 19, 1962.]

however, the adjudication has been made; and the Court is unanimous in concluding that these Indians have no right to use fish traps. A stay is not needed to protect rights that may arise from future Regulations, as in the *Metlakatla* case, for any administrative power of the Secretary of the Interior to allow the Kake and Angoon Indians to use traps is lacking. And with all deference, a stay is not shown to be justified on any other grounds.

A stay that continues in use for another season a device as nefarious as the fish trap needs potent reasons.

The destruction caused by fish traps is notorious. Mr. Justice Van Devanter, conservationist as well as jurist, described an Alaskan fish trap [1] designed "to catch about 600,000 salmon in a single season," a trap which "will tend materially to reduce the natural supply of fish accessible to the Indians." *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 87. Dr. David Starr Jordan in his 1904 report of the Alaska Salmon Commission stated, "If we consider the ultimate interests of Alaska and the permanence of her salmon fisheries, no traps should be allowed anywhere . . . ." Gruening, The State

[1] The salmon trap is described by the Alaska Supreme Court as follows:

"A trap consists of tall stakes or mechanically driven piling extending from the shore to varying distances seaward, depending on the depth of the water. Wire or webbing is stretched across the stakes or piling from the shore to the seaward end and from the ocean bottom upward to a point above high water. Located at the seaward end is an extended wing or hook and an opening into the heart and pot. When the webbing is on the ocean bottom fish cannot pass around the trap at the shoreward end. One tendency of migrating fish is to parallel the shoreline and travel with the incoming tide. Fish stopped by the webbing of a trap will eventually follow it seaward in an attempt to by-pass the obstruction. The wing or hook is constructed so as to discourage by-passing and divert the fish into the heart and pot where they remain. With some variations in construction, floating traps adapted to deep water are commonly used and are highly productive." *Metlakatla Indian Community* v. *Egan*, —— Alaska ——, 362 P. 2d 901, 903.

of Alaska (1954), p. 169. Beginning in 1931 the Territorial Legislature memorialized Congress condemning the use of the fish trap because of its adverse effect on salmon and on the salmon industry. See Alaska, Sess. Laws, 1931, p. 275; Alaska, Sess. Laws, 1953, pp. 401–402; Alaska, Sess. Laws, 1955, pp. 447–448. The 1955 Resolution ended by saying:

"WHEREAS, the vast majority of Alaskans, after many decades of first hand experience and study, are convinced that no salmon conservation program can achieve lasting effect unless salmon fish traps are abolished immediately, forever, from Alaskan waters;

"NOW THEREFORE, your Memorialist, the Legislature of the Territory of Alaska, respectfully urges and requests that immediate legislation be enacted abolishing fish traps from the waters of the Territory of Alaska."

In 1959, the Alaskan Native Brotherhood, organized to speak for the Indians,[2] reiterated its stand "for complete abolition of traps."

Senator Gruening, on March 6, 1962, issued a statement to the Associated Press which emphasized another invidious effect of the use of fish traps by the Indians:

"The 1945 Alaska Territorial Legislature, at my behest, while I was Governor, passed an Act outlawing discrimination in public establishments based on race, creed, or color. This was designed to safeguard Alaska's Native people who had been subject to such discrimination and it did so safeguard them. Secretary Seaton's action would have created an inverse discrimination against Whites deeply sowing seeds of bitterness and arousing interracial friction and antagonism which has no place in America and had disappeared in Alaska. The performance was an inexcusable pressure play. In a referendum on fish

---

[2] See Federal Indian Law (Dept. of Interior, 1958), p. 963.

traps in 1948, 88.7% of the people of Alaska voted for trap abolition, and Angoon's vote was 49 to 9 and Kake's 123 to 6 against traps. Yet Secretary Seaton sought to force traps upon them and on the people of Alaska.

"The Court's decision in the Metlakatla case differs in its conclusion from the Kake and Angoon cases only because of Metlakatla's historically different and unique legal status. It leaves the course of action open to the present Secretary of Interior. It is to be hoped that both he and the people of Metlakatla, who in the 1948 referendum—though owning seven traps—voted 112 to 33 for trap abolition, will agree that privilege and discrimination based on race should finally disappear totally from the 49th State."

The devastating effect of fish traps upon Alaska's economy was described by the Alaska Supreme Court:

"It has not been unusual for a single trap to catch as many as 600,000 fish in a single season. The impact of the catch of eleven traps on the fisheries of Southeastern Alaska is considerable from the point of view of conservation. The season's catch of a gill net or purse seine fisherman in the same area might run from 2,000 to 10,000 fish respectively. The discrimination against all fishermen, natives and whites alike, resulting from the Secretary's 1959 regulation, creates social problems for the state which it is powerless to remedy if the Secretary's claimed right is upheld. The intention to retain such a power over the basic industry of the state was not intimated in the wording of the Alaska Statehood Act, much less described. Such a power has never been reserved as to any other state admitted into the Union as far as this court is aware. The fisheries of Alaska, although pitifully depleted, are still its basic industry. The

economy of the entire state is affected, in one degree or another, by the plentitude of the salmon in a given season. The preservation of this natural resource is vital to the state and of great importance to the nation as a whole." *Metlakatla Indian Community v. Egan,* —— Alaska ——, 362 P. 2d 901, 915.

The fish trap is "efficient," [3] an adjective which, by conservation standards, means that it is "destructive." As Senator Gruening has said, "Its economic and social aspects have been under unceasing attack by virtually all fishermen, by cannery men who do not own or control traps and have to depend on other types of gear for their salmon, and by the Alaska public generally." Gruening, The State of Alaska (1954), pp. 170–171.

Moreover, the fish trap is not a selective device, taking only one type of fish. It catches everything that swims; and fish that are not "in season" are as irretrievably lost as are those in which the fishermen have the greatest interest.

We should not allow such a destructive device [4] to be employed, absent a claim of legal right or a showing of

---

[3] Those who defend the fish trap rate it as being a degree better than the purse seine. This is because the purse seine is movable and "difficult to keep track of by the inspectors," while the fish trap is stationary and can be readily inspected. See Hearings before Subcommittee, Senate Committee on Fisheries, on S. 5856, 62d Cong., 2d Sess., pp. 458–459.

[4] Those who defend the fish trap are quick to add "provided the trap has no jigger." Hearings, *supra,* note 3, at 458. Senator Gruening describes the "jigger":

"The 'jigger' is a lateral extension of the trap, curved or hooked, extending away from the wall of the outer 'heart' into the direction from which the salmon come. It makes avoidance of the trap toward which at that point the salmon are heading almost impossible." Gruening, The State of Alaska (1954), p. 170.

It is significant that the Regulations under which these Indians are now allowed to fish during the 1962 season do not bar the "jigger" (see 25 CFR § 88.3), though the Territorial Legislature as early as 1913 had banned it. See Gruening, *op. cit., supra,* at 169.

imperative need. As I have said, no such right exists subsequent to our unanimous decision of March 5, 1962. It is, of course, provided in 28 U. S. C. § 2106 that in disposing of cases here for review we may not only "affirm, modify, vacate, set aside or reverse," but also "require such further proceedings to be had as may be just under the circumstances." But we have no reason for concluding that it would be unjust to turn these Indians to fishing with gill nets or hand lines like everyone else. All we have before us is a motion made in October 1961 to expedite a hearing in these cases. In that motion it is said:

> "The 1962 fishing season in Alaska begins in July, 1962. To prepare for this fishing season, Appellants must commit large sums of money for materials and supplies, including wire, netting, and cannery equipment. A large portion of these materials must be ordered not later than January, 1962. If Appellants' right to fish with traps were not to be upheld, their investment would be wasted. Conversely, if Appellants' right to fish with traps is upheld, Appellants will be unable to fish unless substantial sums of money are committed early in 1962."

Whether any sums have in fact been committed to the construction of these nefarious fish traps we do not know. Why these Indians cannot fish in the manner of all other fishermen is not apparent. Since the fishing season starts in July, they have four months from the date of our decision to prepare for it. What problems, if any, they may have in fishing without traps, we do not know. They have asked for no stay at this juncture of the litigation. We act gratuitously and without any knowledge of the actual facts. We in effect dispense to this group who have no legal rights a largesse, as if we sat as a Commission on Indian Affairs, giving a part of the public domain to this favored few.

Those who know the story of the decline of the salmon [5] can only look with concern on any action that further depletes the supply of this choice national asset. Severe human hardship may result from the decision we handed down on March 5, 1962. But if that is true, we should

[5] James Wickersham, delegate in Congress from Alaska, testified in 1914 as to the start of the depletion of the salmon:

"I want to call the attention of the committee to one stream which has been depleted in California, and that is the Sacramento River. The Sacramento River was one of the first rivers upon which canners put up salmon. In 1864 the first canned salmon were packed in California on the Sacramento River. In 1882 there were 200,000 cases of canned salmon put out from the Sacramento River—48 pounds to the case, making a total of 4,800 tons of salmon canned during that year on the Sacramento River.

"Then it began to decrease, and it went down to 123,000; then to 90,000; then to 57,000; then to 31,000; then to 14,000; and finally in 1906 there were none put up on that river. For three or four years there were none put up, but in 1913 there were 950 cases put up on the Sacramento River. In short, that great salmon stream has been utterly destroyed and there are no fish there now, substantially.

"Of course, that situation resulted from several causes. It resulted from overfishing, and from putting barriers across the streams to catch the fish, and it resulted in part from mining. All these things are going to happen in Alaska. There is mining going on there now on many of these streams. All the obstacles that operated to bring about that evil in the Sacramento River will operate in Alaska as soon as they open up that country. As soon as that is done and they get to work in there, the streams there are going to be depleted.

"When the first Russians went to Kadiak Island, more than a century ago, they found the Karluk salmon stream surrounded by Indians. It was a great fishing spot. That stream has probably turned out more canned salmon than any other stream in Alaska. Dr. Evermann and all those who were acquainted with it say it was the greatest salmon stream in the world. I saw the fishing going on there in 1903. I know how it was done. They had at one side a great post set in the ground sufficient to hold the nets. The nets were put into big boats, and they were long nets, some of them half a mile long, I suppose, and they were carried out into the bay, and as they came around they were fastened to a rope on the shore, to which was attached a big engine, and when they got that far along

require that it be shown. The disposition of these cases four months before the 1962 fishing season starts gives ample notice that new ways of earning a livelihood must be found other than the lazy man's device of the fish trap.[6]

---

the big engine pulled the nets for them. The number of fish which they caught in there is simply unbelievable, and they were pulled in by machinery. The men themselves were unable to handle big nets of that kind. They were able to handle the small nets, but when they got machinery handling the fish for them they soon destroyed that stream. Every fisherman in that region knows it is destroyed; knows that the greatest salmon stream in Alaska has been destroyed." Hearings before House Committee on the Territories on H. R. 11740, 63d Cong., 2d Sess., pp. 45–46. For later discussions on the plight of the salmon of the Pacific, see Hearings before Merchant Marine and Fisheries Subcommittee, Senate Committee on Interstate and Foreign Commerce, on S. Con. Res. 35, pt. I, and on S. 502, 86th Cong., 1st Sess.; Hearings before Senate Committee on Interstate and Foreign Commerce on S. Con. Res. 35, S. 2586 and S. 1420, pt. II, 86th Cong., 1st Sess.

The depletion of salmon from California to Alaska is notorious. See Dufresne, Troubled River, Field and Stream, July 1959, p. 27; Netboy, Salmon of the Pacific Northwest (1958); 1958, A Year of Surprise in Pacific Salmon Canning, Pacific Fisherman, Jan. 25, 1959, p. 81; *id.*, Jan. 25, 1960, p. 53; *id.*, Jan. 25, 1961, pp. 13, 23; Van Fleet, The Vanishing Salmon, Atlantic, May 1961, pp. 48, 51:
"In my estimation, the former great wealth of the salmon fishery in California is doomed. In Oregon, the main runs are badly crippled but not entirely gone. In Washington, the runs are diminished along the coast and in the waters around Puget Sound, but careful husbandry could even bring about an increase. My advice to Alaska is to heed the lesson so well portrayed in the states to the south of it."

The Hearings on S. 502, *supra,* are replete with examples of the impact on people and on the Alaska economy of the salmon depletion. This depletion also has a serious impact on wildlife. For an account of what a scarcity of salmon means to the brown bear population, see the Hearings on S. 502, *supra,* at 25–26.

[6] "A trap fishes in the night when the man sleeps; it employs less men than other kinds of gear; it is a labor-saving device . . . ." Hearings on S. 5856, *supra,* note 3, at 389.