08-1194-cv(L)
State of New York v. Shinnecock Indian Nation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2010

(Argued: March 7, 2011      Decided: June 25, 2012)

Docket Nos. 08-1194-cv(L), 08-1195-cv(CON)

------------------------------------------------------x

STATE OF NEW YORK, NEW YORK STATE RACING AND WAGERING
BOARD, and NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION,

Plaintiffs-Appellees,

TOWN OF SOUTHAMPTON,

Consolidated-Plaintiff-Appellee,


-- v. --

SHINNECOCK INDIAN NATION, LANCE A. GUMBS, RANDALL KING,
KAREN HUNTER, and FREDERICK C. BESS,

Defendants-Appellants.*

------------------------------------------------------x

B e f o r e :  WALKER, B.D. PARKER, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court

for the Eastern District of New York (Joseph F. Bianco, Judge)

granting a permanent injunction prohibiting the Shinnecock Indian

Nation and its tribal officials from developing a casino on a

---

*    The Clerk of the Court is respectfully directed to amend the
official caption as set forth above.

1

plot of land known as Westwoods without complying with the laws of New York State and the Town of Southampton. Defendants-Appellants challenge a number of the district court's factual and legal conclusions.

Because we find that the district court lacked subject matter jurisdiction over this action, we do not reach the merits of the appeal. We therefore VACATE the judgment of the district court and REMAND with instructions for the district court to remand the case to New York state court.

Judge HALL dissents in a separate opinion.

CHRISTOPHER H. LUNDING (Evan A. Davis, Ashika Singh, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y., for Defendants-Appellants.

DENISE A. HARTMAN, Assistant Solicitor General (Eric T. Schneiderman, Attorney General of the State of the New York, Barbara D. Underwood, Solicitor General, Andrew D. Bing, Deputy Solicitor General, on the brief), Albany, N.Y., for State Plaintiffs-Appellees.

MICHAEL S. COHEN (David M. Schraver, David H. Tennant, on the brief), Nixon Peabody LLP, Jericho, N.Y., for Consolidated Plaintiff-Appellee Town of Southampton.

JOHN M. WALKER, JR., Circuit Judge:

The Shinnecock Indian Nation and its tribal officials (collectively, the "Shinnecock" or the "Tribe") appeal from a

judgment of the United States District Court for the Eastern District of New York (Joseph F. Bianco, Judge). After a bench trial, the district court granted a permanent injunction prohibiting the Tribe from developing a casino on a plot of land known as Westwoods without complying with the laws of New York State and the Town of Southampton. The Shinnecock object to a number of the district court's factual and legal conclusions, including its findings: (1) that tribal sovereign immunity from suit does not bar this action; (2) that the Shinnecock's aboriginal title to the land at Westwoods was extinguished in the seventeenth century; (3) that even if aboriginal title had not been extinguished, equitable principles would prevent the Shinnecock's development of a casino in violation of state and local law; and (4) that the federal Indian Gaming Regulatory Act ("IGRA") supplanted any federal common law right the Tribe may have had to operate the casino. They also argue that the Bureau of Indian Affairs's recent recognition of the Shinnecock Indian Nation moots the injunction.

We conclude that the district court lacked subject matter jurisdiction over this action, and thus do not reach the merits of this appeal.

**BACKGROUND**

In 2003, the Shinnecock entered into a contract for the construction of a 61,000-square-foot casino on 80 acres of land

3

it owned, known as Westwoods, in the town of Southampton, New York. The Tribe did not obtain permits from the State of New York or the Town of Southampton. In July 2003, the Shinnecock began bulldozing trees and brush to begin construction.

On or about June 29, 2003, the State of New York, the New York State Racing and Wagering Board, and the New York State Department Of Environmental Conservation (collectively, "the State") sued the Tribe in New York State Supreme Court, seeking to prevent it from going forward with the casino without complying with state law. The State asserted five claims. The first alleges that the planned casino violates state law, and is outside the scope of the IGRA – a federal act that authorizes tribal gaming under certain conditions – because the Tribe is not federally recognized and Westwoods is not "Indian lands." The remaining claims allege that construction of the casino would violate state environmental laws because the Tribe did not obtain required permits or conduct a required environmental review.[1]

---

[1] Specifically, the second claim alleges that the Shinnecock failed to "prepare a Stormwater Pollution Prevention Plan and file a Notice of Intent pursuant to the [New York State Department of Environmental Conservation's ("DEC")] General [State Pollutant Discharge Elimination System ("SPDES")] Permit for Construction," and thus "have no right to commence construction of a casino" at Westwoods. The third claim alleges that the Shinnecock failed "to obtain a[n] SPDES permit pursuant to [New York Environmental Conservation Law ("ECL")] § 17-0803," and, therefore, "have no right to commence construction of a casino [at Westwoods] with a wastewater treatment facility that will discharge effluent to the waters of the State." The fourth claim alleges that the Shinnecock failed "to obtain a permit

The State sought an injunction preventing the Tribe from constructing and operating a gaming facility at Westwoods.  It also sought a declaration that, among other things, the Tribe may not pursue gambling activities at the site until it complies with state law or the IGRA.

The Shinnecock removed the case to federal court on the basis that the State's complaint pleaded issues of federal law. The removal notice identified four "conclusions about federal law" alleged in the complaint, all of which relate to the complaint's assertion that federal law does not authorize the Shinnecock to construct a casino at Westoods in violation of state and local law.  In its answer to the complaint, the Tribe admitted that it had not obtained any permit from the State of New York or the Town of Southampton.  It asserted, however, that on the basis of federal Indian law, neither the State nor the Town has the power to regulate activities at Westwoods because the Tribe has aboriginal title to the land.

---

pursuant to ECL § 15-1527," and thus "have no right to commence construction of a casino [at Westwoods] with a new well with an installed pumping capacity in excess of forty-five gallons per minute."  The fifth and final claim alleges that the Shinnecock "failed to conduct assessments or studies necessary for DEC's compliance with [the New York State Environmental Quality Review Act] . . . , or to provide DEC with funds sufficient to allow DEC to conduct such assessments or studies," and, as a result, "DEC may not issue permits that would allow the construction and operation of a casino" at Westwoods.

The State moved to remand the action to state court, disputing the presence of a federal question on the face of its complaint. It argued that its complaint is based entirely on violations of New York state law, that the Shinnecock's removal is based on the complaint's anticipation of the Shinnecock's defenses, and that the complaint's reference to the IGRA asserts only that the IGRA does not apply, whereas only state law does.

Judge Platt, to whom this case was initially assigned, denied the State's motion. He found that the State's complaint asserts a violation of the IGRA and raises federal questions about the possessory rights of Indian tribes. New York v. Shinnecock Indian Nation, 274 F. Supp. 2d 268 (E.D.N.Y. 2003).

Shortly before Judge Platt's decision on the remand motion, the Town of Southampton (the "Town") filed a separate suit alleging that the Shinnecock's construction of a casino would violate the Town's zoning, land use, and wetlands protection ordinances, and seeking injunctive and declaratory relief.[2] The

---

[2] Specifically, the Town's first claim alleges that the Shinnecock failed to apply for or receive "site plan approval with respect to [Westwoods] for any purpose whatsoever," and to apply for or receive "permission from the Town Planning Board to engage in" site preparation activities, "including but not limited to, the clearing of land, removal of trees, grading, regrading, bulldozing, and/or excavating at [Westwoods] (the 'Site Preparation Activities')," and that the Shinnecock's "conduct of some or all of the Site Preparation Activities" thus violates "Section 330-184, subd. I" of the Code of the Town of Southampton, New York (the "Town Code"). The Town's second and final claim alleges that the Shinnecock failed to apply for or obtain a permit required by "Section 325-6, subd. A. of the Town

6

Shinnecock removed the Town's action to federal court.  The Town moved to remand, but the district court suspended decision on the motion and the Town eventually withdrew it when the district court consolidated the Town's suit with the State's.

After additional rounds of motion practice, the district court conducted a bench trial.[3]  The parties introduced evidence of the history of the Shinnecock and their aboriginal title to the land at Westwoods, and of the casino's potential impact on neighboring landowners and the Town of Southampton.

At the close of trial, the district court ruled in favor of the State and the Town and granted a permanent injunction prohibiting the Shinnecock from building a casino on Westwoods without complying with state and local law.  New York v. Shinnecock Indian Nation, 523 F. Supp. 2d 185 (E.D.N.Y. 2007); see also New York v. Shinnecock Indian Nation, 560 F. Supp. 2d 186 (E.D.N.Y. 2008) (modifying injunction).  The district court found (1) that tribal sovereign immunity from suit does not bar this action; (2) that the Shinnecock's aboriginal title to the land at Westwoods was extinguished in the seventeenth century; (3) that even if the Shinnecock had unextinguished aboriginal

---

Code" – which regulates activities permissible on land, such as Westwoods, that is designated as a wetlands area – and that the Tribe thus may not conduct Site Preparation Activities at Westwoods.

[3]  On the sixth day of trial the case was reassigned from Judge Platt to Judge Bianco.

title, equitable considerations would, under <u>City of Sherrill v. Oneida Indian Nation</u>, 544 U.S. 197 (2005), bar their development of a casino at Westwoods because of the disruption it would cause to the Town and the long-standing expectations of its residents; and (4) that the IGRA, which did not apply to the Shinnecock because they were not a federally-recognized tribe, supplanted any federal common law right Indian tribes might have had to operate casinos. <u>See</u> <u>Shinnecock Indian Nation</u>, 523 F. Supp. 2d at 249-302.

The Shinnecock appealed. They challenge the district court's legal and factual conclusions and argue that the federal government's recent recognition of the Tribe has mooted the injunction.

**DISCUSSION**

Before we can address the merits of the Shinnecock's appeal, we must determine whether the district court had subject matter jurisdiction over the case. <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, 488 F.3d 112, 121 (2d Cir. 2007). Although the plaintiffs argued below that federal jurisdiction was absent, on appeal all parties take the position that subject matter jurisdiction exists based on the federal questions the case raises. Nevertheless, we must conduct an independent inquiry. Jurisdiction cannot be created by the consent of the parties. <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S.

83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (internal quotation marks omitted)); City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 125-26 (2d Cir. 2011).

**I. The Well-Pleaded Complaint Rule**

Under 28 U.S.C § 1331, federal district courts have jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." A cause of action arises under federal law only when the plaintiff's "well-pleaded complaint" raises an issue of federal law. Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987). "The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts." Id. (quoting Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9-12 (1983)).

A cause of action raises an issue of federal law only when "a right or immunity created by the Constitution or laws of the United States . . . [is an] essential [element] of the . . . cause of action." Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936). It is not enough that the complaint anticipates a potential federal defense. Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987); Franchise Tax Bd., 463 U.S. at 12; Gully,

299 U.S. at 116; Taylor v. Anderson, 234 U.S. 74, 75-76 (1914). And this is true even if the parties concede that the defense is the only disputed issue in the case. Caterpillar Inc., 482 U.S. at 393; Franchise Tax Bd., 463 U.S. at 12. Moreover, a declaratory judgment claim that raises an issue of federal law does not give rise to federal question jurisdiction if, "but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action." Franchise Tax Bd., 463 U.S. at 16.

In this case, the State and Town allege only violations of state and local law. The State alleges that the Tribe's construction of the casino would violate state gaming and environmental laws and the Town alleges that it would violate local zoning and wetlands protection ordinances. Although the State's complaint refers to federal law, these references assert only that federal law does not immunize the Shinnecock's conduct and thus cannot provide a defense against the Tribe's violation of state and local law. For example, the State's complaint alleges that:

> 74. Because federal recognition of a tribe of Indians is a condition precedent under [the] IGRA for any tribe of Indians in New York State to conduct certain gaming activities which would otherwise be in violation of State law, and because the United States has not granted such recognition to the [Tribe], it and its officials are subject to and must comply with the State gaming laws in order to conduct such gaming. . . .
>
> 76. . . . [B]ecause the site of the planned casino is

10

> not "Indian Country" as defined in federal law and in [the] IGRA, the Cabazon decision[, which arguably supports the Shinnecock's right under federal law to construct the casino free from local regulation,] has no application at all.

Because the complaint's references to federal law only anticipate and refute the Shinnecock's defenses, they do not give rise to federal question jurisdiction. As Justice Cardozo explained in Gully, a complaint "will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense." 299 U.S. at 113; see also Oklahoma Tax Comm'n v. Graham, 489 U.S. 838, 841 (1989) (noting that although "[t]ribal immunity may provide a federal defense to [the plaintiff's] claims[,] . . . it has long been settled that the existence of a federal immunity to the claims asserted does not convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law").

**II. Substantial Federal Question Exception**

The State and Town argue that their complaints give rise to federal question jurisdiction whether or not the complaints assert a federal cause of action because their right to relief depends on the resolution of substantial questions of federal law. To prevail on their claims that the Shinnecock's construction of a casino would violate state and local law, the State and Town must establish, among other things, that federal

11

Indian law does not preclude the application of state and local law to the Tribe's activities at Westwoods. Indeed, this was essentially the only issue in dispute at trial. The State and Town argue that the presence of this issue in the case is sufficient to establish federal question jurisdiction.

In arguing that the federal law issues on which their right to relief depends give rise to federal question jurisdiction, the State and Town rely on Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005). In Grable, the Supreme Court acknowledged that "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." Id. at 312. The case involved a state law action Grable had brought asserting superior title to certain real property the IRS had seized to satisfy Grable's federal tax delinquency. Id. at 311. After the IRS seized the property, it notified Grable, waited until the 180-day statutory redemption period expired, and sold the property to Darue. Id. at 310-11. Grable sued Darue, claiming that Darue's title to the property was invalid because the IRS had failed to notify Grable of the seizure in the manner federal law requires. Id. at 311. Darue removed the case to federal court on the basis that Grable's state law quiet title claim depended on the interpretation of federal tax law's notice requirement. Id. Grable moved to remand the case to state court but the district court denied the

12

motion and ruled in favor of Darue on the merits. Id. The court of appeals affirmed, and the Supreme Court granted certiorari on the jurisdictional issue. Id.

The Supreme Court held that federal question jurisdiction was present because Grable's state law claim "necessarily raise[d] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Id. at 314. First, the Court explained that state law required Grable to "specify" in its complaint "'the facts establishing the superiority of [its] claim.'" Id. (quoting Mich. Ct. Rule 3.411(B)(2)(c) (West 2005)). Because Grable premised its quiet title claim on the IRS's failure to give it adequate notice, whether the notice complied with the federal statute was an essential element of its claim. Id. at 315. The Court went on to conclude that the meaning of the federal tax provision was actually disputed and was an important issue of federal law, and that federal jurisdiction over the case would not disturb "the federal-state division of labor." Id. The exercise of federal question jurisdiction over Grable's action was thus appropriate.

Unlike Grable's quiet title claim, the claims that the State and Town assert in this case do not "necessarily raise a . . . federal issue." Id. at 314. The question whether the

13

Shinnecock's construction of the casino would violate state and local law is distinct from the questions whether sovereign immunity from suit under federal law bars these actions and whether federal law precludes the State and Town from regulating the Shinnecock's activities at Westwoods.[4]  For example, if the

---

[4]     The dissent agrees that the issues in this case regarding the Tribe's defense of sovereign immunity from suit, conferred on the Tribe by federal law, do not give rise to federal question jurisdiction.  Dissent at 3.  However, the dissent posits an additional, "antecedent" issue: "the plaintiffs, in order to establish that it has any authority over the tribe's activities at issue, must prove that Westwoods is not Indian land."  Id.  It is this issue, according to the dissent, that gives rise to federal question jurisdiction.  Id. at 3-7.
        We fail to perceive a difference between the plaintiffs' right to bring an action enforcing state and local law at Westwoods, and the Tribe's sovereign immunity from suit and local regulation of activities at Westwoods.  It appears to us that the question whether plaintiffs can bring this action is simply a restatement of the question whether the Tribe is immune from suit and from state and local regulation.  The dissent does not appear to point to any other factor that would bar plaintiffs from bringing suit to enforce the application of state and local regulation to activities at Westwoods.  Moreover, even if the issue the dissent posits could coherently be distinguished, it still comes into the case as a defense, because – contrary to the dissent's ipse dixit conclusion – it is not necessarily raised by the State's and Town's affirmative claims.  We thus do not see how jurisdiction would be appropriate under Grable.
        The dissent also notes, apparently favorably, the district court's holding "that the state had the burden of proving at trial that the tribe's aboriginal title had been extinguished."  Id. at 4 n.1.  For that conclusion, the district court relied on 25 U.S.C. § 194, which provides that:

> In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

14

Shinnecock were to have established that their construction of the casino complied with state and local law, the court could have resolved the case without reaching the federal issues.[5] Because the claims do not necessarily raise a federal issue, the substantial federal question exception to the well-pleaded complaint rule does not apply.[6]

The district court's conclusion is erroneous in light of <u>Wilson v. Omaha Indian Tribe</u>, 442 U.S. 653, 667 (1979), which held that Congress did not intend that states bear the burden set forth in 25 U.S.C. § 194. The Court's reasoning also applies to towns. Furthermore, even if Section 194 were to apply here, it would appear to implicate the Tribe's affirmative defense inasmuch as it places upon tribes the burden of "mak[ing] out a presumption of title" in the first instance.

[5] The dissent misunderstands what it construes as "[t]he majority['s] proffer[] that the district court could have resolved the case without needing to reach whether Westwoods is Indian land." Dissent at 5 n.3. We articulate this "proffer" to illustrate the conceptual point that the issues regarding the Tribe's compliance with state and local law are distinct from the issues regarding the Tribe's federal immunities. Unlike the plaintiff's quiet title claim in <u>Grable</u>, which had no content other than the federal law issue on which it was based, the State's and Town's claims here challenging the Tribe's non-compliance with state and local law could be decided without reference to federal law. As noted in Part I of our discussion, it is irrelevant that the Tribe's non-compliance with state and local law was not actually in dispute: "it is now settled law that a case may <u>not</u> be removed to federal court on the basis of a federal defense, . . . even if both parties concede that the federal defense is the only question truly at issue." <u>Caterpillar Inc.</u>, 482 U.S. at 393. While we agree with the dissent that it is "beyond cavil" that the federal issues in this case are "necessary to the resolution of the state's claims," Dissent at 5 n.3, we do not see the relevance of this statement to the jurisdictional question. Complete defenses, by definition, always must be decided before a claim can be resolved.

[6] In arguing for the existence of subject matter jurisdiction, the dissent also relies on various considerations dealing with

15

**III. Possessory Land Claims by Indian Tribes**

Finally, the Shinnecock argue that federal question jurisdiction over this case can be premised on an extension of the Supreme Court's decision in <u>Oneida Indian Nation v. County of Oneida</u>, 414 U.S. 661 (1974). <u>Oneida Indian Nation</u> involved the Indian tribe's suit for damages based on the County's wrongful possession of tribal land. <u>Id.</u> at 663-65. The Court held that the case gave rise to federal question jurisdiction because the Indian tribe's "complaint asserted a current right to possession conferred by federal law, wholly independent of state law." <u>Id.</u> at 666.

The Court took care, however, to note that its decision did not "disturb the well-pleaded complaint rule." <u>Id.</u> at 676. It explained that "this is not a case where the underlying right or obligation arises only under state law and federal law is merely alleged as a barrier to its effectuation." <u>Id.</u> at 675. Rather, "the right to possession itself is claimed to arise under federal law in the first instance." <u>Id.</u> at 676. To clarify this point further, Justice Rehnquist wrote a concurring opinion

---

federal-state comity and the importance of the federal issue here. Dissent at 7-8. We do not see these considerations as part of the jurisdictional calculus. <u>See</u> <u>Grable</u>, 545 U.S. at 314 ("[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, <u>which</u> a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." (emphasis added)).

"emphasiz[ing] that the majority opinion does not disturb the long line of this Court's cases narrowly applying . . . the well-pleaded complaint rule." Id. at 683. Underscoring the majority opinion's conclusion, he stated that "this is not a case which depends for its federal character solely on possible federal defenses or on expected responses to possible defenses." Id. at 682-83.

The case before us, in contrast, does "depend[] for its federal character solely" on the federal defenses at issue. Because the Oneida Indian Nation decision carefully distinguished that case from one in which federal issues related to Indian land arise defensively, it does not support finding federal question jurisdiction in this case.[7]

Accordingly, we conclude that federal subject matter jurisdiction over this action is absent.

---

[7] The dissent protests that the Oneida Indian Nation Court "found multiple bases satisfying federal subject matter jurisdiction": (1) "the existence of a possessory land claim by a tribe in the complaint"; (2) "'the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands'"; and (3) jurisdiction under 25 U.S.C. § 233. Dissent at 6 n.4 (quoting Oneida Indian Nation, 414 U.S. at 677-80). With regard to the first two bases, and as discussed above, the indisputably federal "Indian land" issue arose in Oneida Indian Nation in the context of the plaintiff's claim rather than as an affirmative defense, as it does here. As for 25 U.S.C. § 233, that law is not a basis for federal jurisdiction but a cession from U.S. courts to New York courts of jurisdiction over certain disputes involving tribes; in Oneida Indian Nation, the Court found jurisdiction consistent with Section 233 because the statute exempts from its jurisdictional cession civil land-dispute actions. See Oneida Indian Nation, 414 U.S. at 674 n.9, 679-82.

17

## CONCLUSION

For the foregoing reasons, we VACATE the judgment of the district court and REMAND with instructions for the district court to remand the case to New York state court.

HALL, Circuit Judge dissenting:

Federal question jurisdiction exists where, *inter alia*, it is clear from the face of the complaint that "the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law." *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983). From the record and the pleadings, the tribe is fee simple owner of Westwoods and occupies that tract of land outright, invoking at the outset of the case a presumption that Westwoods is Indian land and is thus beyond the regulatory purview of the state. Only by demonstrating (1) that the tribe does not hold aboriginal title to the land and (2) that Westwoods in fact is *not* Indian land within the meaning of 25 U.S.C. § 2703(4) and 18 U.S.C. § 1151— two issues that are irrefutably questions of federal law and ones reflecting an important national interest—can the plaintiffs assert the right to regulate the tribe's construction project in the first instance. *See Oneida Indian Nation of New York State v. County of Oneida, New York,* 414 U.S. 661, 668-70 (1974) (holding that questions concerning the "possessory rights of Indian tribes to their aboriginal lands" arise under the Constitution, laws, or treaties of the United States within the meaning of 28 U.S.C. § 1331).

The majority, overlooking that the questions of whether Westwoods is "Indian land" and whether the Tribe holds aboriginal title to the land are obvious from the face of the complaint, focuses its attention only on the tribe's defenses to regulation and the plaintiffs' anticipation of those defenses. It may be that resolving whether Westwoods is Indian land or is held by aboriginal title is necessary also to the tribe's defenses or anticipated defenses; nonetheless, if the State or the Town are going to exercise any right to regulate activities on the land, the resolution of those questions in the negative is absolutely necessary to resolving, the plaintiffs' case-in-chief. By focusing on the tribe's defenses instead of the complaint, the majority,

inadvertently I am certain, ensures that every state or local enforcement action brought against an Indian tribe alleged to be occupying non-"Indian land," whether commenced initially in federal court or commenced in state court and removed to federal court, will be dismissed for want of federal subject matter jurisdiction. The net effect is that the resolution of title to tribe-occupied lands at issue in those enforcement proceedings will necessarily be determined by a state court. Indian tribes in New York, Connecticut, and Vermont subject to state enforcement actions will no longer have the option of a federal forum to resolve those disputes regarding aboriginal title because, by virtue of the majority's decision today, the federal courts are without jurisdiction to resolve them.

This result flies in the face of over 200 years of federal Indian law jurisprudence, which has evolved in large part to address and accommodate the historically thorny nature of tribal-state relations and a fear of "home-cooking" in state courts, particularly as to issues involving the assertion of state jurisdiction over Indian tribes. *See Organized Village of Kake v. Egan*, 369 U.S. 60, 71-75 (1962) (surveying the evolution of "the relation[s] between the Indians and the States" over the course of United States history and the attendant metamorphosis of state jurisdiction over tribes). *See also United States v. Kagama*, 118 U.S. 375, 384 (1886) (describing the states as often the "deadliest enemies" of the tribes). *Cf. Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 559 n.10 (1983) (describing legislative intent behind 28 U.S.C. § 1362, which provides original federal court jurisdiction over civil actions brought by Indian tribes, as "reflect[ing] a congressional policy *against* relegating Indians to state court when an identical suit brought on their behalf by the United States could have been heard in federal court") (emphasis added).

For the foregoing reasons and those that follow, I respectfully dissent from the opinion of my colleagues that orders this case remanded to the state court for want of federal subject matter jurisdiction. Unlike my colleagues in the majority, I would hold that the plaintiffs' have adequately pleaded a federal question sufficient to support removal of this action to federal court. Satisfied that we have jurisdiction, I would go on to address the more pressing, and frankly, more interesting issue in this case: the scope of tribal sovereign immunity. On that latter issue, I would hold that tribal sovereign immunity does not bar the instant suit, and I would affirm on the merits the detailed and well-reasoned decision of the district court.

A.     Federal Question Subject Matter Jurisdiction

The majority misconstrues the tribe's defense of sovereign immunity as the pertinent federal issue purporting to give rise to federal question jurisdiction. Majority Op. 10-11. I agree that the necessity of determining whether tribal sovereign immunity bars the action is *not* the basis upon which federal question jurisdiction arises in this case. Rather, federal question jurisdiction exists because the plaintiffs, in order to establish that they have any authority over the tribe's activities at issue, must prove that Westwoods is *not Indian land*. The majority ignores the antecedent nature of this inquiry and overlooks that the plaintiffs' authority to regulate the tribe's activities on the Westwoods parcel necessarily turns on whether the tribe holds aboriginal title to the land in question and ultimately whether Westwoods is Indian land—issues plainly arising under the laws of the United States.

In its complaint, the state affirmatively pleads that the tribe occupies and holds fee simple title to the land at issue; however, the state avers that the tribe's property is "subject to the jurisdiction of New York State" and declares that it will prove, in order to prevail on its claims,

3

that Westwoods is not "Indian Country."[1] J.A. 60, ¶¶ 45, 47. The state also pleads that: "the site of the planned casino is not 'Indian Country' as defined in federal law and in [the ]I[ndian ]G[aming ]R[egulatory] A[ct]"; and "the defendant's property which is the subject of this action, the gaming site, does not constitute 'Indian lands.'" J.A. 60, ¶ 47; J.A. 63, ¶ 76; J.A. 66 ¶ j. The Town, in its complaint, similarly pleads that the tribe is the fee simple owner of the land at issue. Complaint at ¶ 7, *Town of Southampton v. The Shinnecock Tribe,* 2:03-cv-03466 (TCP)(ARL) (E.D.N.Y. July 15, 2003), ECF No. 1-3.

Because the tribe owns and occupies Westwoods, making it *prima facie* Indian land, the plaintiffs' right to relief—regulation of activities at Westwoods—necessarily depends on the resolution of a substantial question of federal law—is Westwoods "Indian land" within the meaning of 25 U.S.C. § 2703(4) and 18 U.S.C. § 1151.[2] *See Franchise Tax Board*, 463 U.S. at

---

[1] In examining and deciding this issue below, the district court held that the state had the burden of proving at trial that the tribe's aboriginal title had been extinguished. *State of New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 256 (E.D.N.Y. 2007). As the district court noted, "it is undisputed that the Nation had aboriginal title at the time of initial discovery in 1640." *Id.* Because the state was "questioning Indian title and arguing aboriginal title has been extinguished," the district court concluded that "the burden lies with [the state]." Id. at 257. As noted by the Majority, the district court's burden of proof analysis relied on 25 U.S.C. § 194 and shifted the burden to the state to prove the extinguishment of aboriginal title. Maj. Op. 14-15 n.4. In *Wilson v. Omaha Indian Tribe,* 442 U.S. 653 (1979) the Supreme Court made clear that a sovereign state is a not a "white person" for section 194 purposes, and, therefore in a trial concerning property rights in which title to the property at issue is presumptively held by an "Indian," the sovereign state does not axiomatically bear the burden of proof. Not addressed by the majority is that the burden shifting mandated by section 194 continues to apply to the other plaintiff in this case — the Town of Southampton. *See Oneida Indian Nation of New York v. City of Sherrill, New York,* 145 F. Supp. 2d 226, 242 (N.D.N.Y. 2001) (citing *Wilson* and section 194 in support of placing burden on the municipality), *aff'd in part, vacated and remanded on other grounds* 337 F.3d 139 (2d Cir. 2003), *rev'd and remanded* 544 U.S. 197 (2005); *see also Monnell v. New York City Dept. of Social Svs.,* 436 U.S. 658, 688-91 (1978) (holding that municipal corporations are "persons" within the meaning of 28 U.S.C. § 1983). Thus, notwithstanding the majority's assertion to the contrary, there is no question that the district court correctly applied section 194 to the Town. In any event, putting aside the issue of which party bears the ultimate burden of proving extinguishment of aboriginal title, the plaintiffs in this action assert a right to regulate land that is presumptively beyond their regulatory purview and therefore, the onus is on the plaintiffs to demonstrate, in the first instance, that they have the authority to regulate activities on the tribe's land.

[2] 25 U.S.C. § 2703(4) defines "Indian lands" as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States government against alienation and over which an Indian tribe exercises governmental powers." 18 U.S.C. § 1151 defines such lands as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which

4

27-28. Indeed, unless the plaintiffs can demonstrate as part of their case in chief that Westwoods is not Indian land, their authority to regulate the tribe's activities in this case is a dead letter. *See Cohen's Handbook of Federal Indian Law* § 6.03[1][a] (Nell Jessup Newton et al. eds., 2005) ("A state ordinarily may not regulate the property or conduct of tribes or tribal-member Indians in Indian country.") (citing *The Kansas Indians*, 72 U.S. 737 (1866); *Worcester v. Georgia*, 31 U.S. 515 (1832); *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125 (1993)).

The plaintiffs challenge the Tribe's right to possession and use of the land in the manner the Tribe is proposing. This challenge is rooted in part on the State's allegation that aboriginal title has been extinguished. It is axiomatic, however, that a tribe's right of occupancy is "entitled to protection of federal law and with respect to Indian title based on aboriginal possession, the 'the power of Congress . . . is supreme.'" *Id.* at 669 (quoting *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 347 (1941)). That being the case, a challenge to that right to occupancy is also governed by federal law and "could only be . . . determined by the United States." *Id.* at 668 (quoting *Cramer v. United States*, 261 U.S. 219, 227 (1923)). Accordingly, before reaching merits of the plaintiffs' underlying state law claims, the court deciding this matter must first determine whether Westwoods is Indian land and is, therefore, subject to regulation in the first place. In short, in order to resolve the state's claim that Westwoods is not Indian land, the court must initially determine if the tribe holds aboriginal title to Westwoods—a substantial federal issue present on the face of the complaint.[3] *Oneida*, 414 U.S. at 670.[4]

have not been extinguished, including rights-of-way running through the same."

[3] With due respect to the majority, that this federal issue is necessary to the resolution of the plaintiffs' claims is beyond cavil. The majority proffers that the district court could have resolved the case without needing to reach whether Westwoods is Indian land because the court *may have* determined that the tribe's casino project was in compliance with state and local laws. Majority Op. at 14-15. On the record in this case, that hypothesis has no legs on which to stand. The tribe's Answer to the Complaint admits that it had not applied for nor received any construction permits or zoning variances for its casino project. J.A. 87-88, ¶¶ 53-54, 58-59. In this case, a trial court

The Supreme Court has determined that jurisdiction pursuant to section 1331 will be satisfied in actions arising under state law, such as the state regulatory enforcement action here, where "the state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005). Under the Supreme Court's test in *Grable*, jurisdiction is satisfied because the determination of whether the tribe holds aboriginal title to Westwoods is an essential element of the state's stated claims and an implicit component of the Town's right to regulation. If Westwoods is "Indian land" then the plaintiffs' enforcement authority will not extend to the land in question. Thus, only by pleading that the tribe does not hold aboriginal title to Westwoods—an issue of federal law that is actually in dispute by virtue of the tribe's pre-suit ownership and occupation of Westwoods as if the tribe does hold Indian title—can the state plead facially viable claims in the present case.

In *Grable,* the plaintiff sued to quiet title to real property that had been seized and sold by the IRS to satisfy the plaintiff's federal tax delinquency. 545 U.S. at 310. The plaintiff argued that the tax sale to the defendant was invalid because the IRS had not given him (the plaintiff) valid notice as required by the federal statute governing IRS tax sales. *Id.* The defendant removed the case to federal court arguing that the plaintiff's state law quiet title action presented a federal question because the plaintiff's claim of title depended on an interpretation of federal

could *never* have held that the tribe was in compliance with the applicable state and local laws, and therefore the court would be *required* to reach the issue whether the tribe holds aboriginal title to Westwoods. Our jurisdictional analysis should focus on the facts of the matter before us and not on an inapposite hypothetical.

[4] To the extent that the majority distinguishes the finding of jurisdiction in *Oneida* from the instant case, the majority overlooks that the *Oneida* court found multiple bases satisfying federal subject matter jurisdiction. Majority Op. at 15-17. The first, the existence of a possessory land claim by a tribe in the complaint; the second, "the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands. . . . ." The Supreme Court also found jurisdiction under 25 U.S.C. § 233. *Oneida*, 414 U.S. at 680

6

law. *Id.* at 311. The Supreme Court held that the plaintiff's state law claim arose under federal law for purposes of federal question subject matter jurisdiction because "[w]hether [the plaintiff] was given notice within the meaning of the federal statute is an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute." *Id.* at 315.

Here, as in *Grable*, federal law is not "precluding" or "providing" the state's causes of action, but rather informing whether the plaintiffs may assert jurisdiction over Westwoods. And so, pursuant to the analysis set out in *Grable*, there is federal subject matter jurisdiction over the enforcement action before us because, at the very least, the plaintiffs must demonstrate, as part of their case-in-chief, that Westwoods is not Indian land in order to assert any regulatory authority over the tribe's activities at that site. *See also Oneida*, 414 U.S. at 678 (finding that "the assertion of a federal controversy does not rest solely on the claim of a right to possession derived from a federal grant of title whose scope will be governed by state law. Rather, it rests on the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession.").

Moreover, in *Grable* the Supreme Court identified a number of considerations a district court should weigh in determining whether the underlying federal issue is one of national importance: (1) the issue is one that "sensibly belongs in federal court;"(2) the issue "appears to be the only legal or factual issue contested in the case;" (3) there exists an important national interest in providing a federal forum for adjudicating the dispute; and (4) there is a risk that recognizing federal jurisdiction under the circumstances would disrupt federal-state comity. 545 U.S. at 315. Each of the *Grable* considerations is present in this case and inform my view that

7

the district court properly held that it had federal subject matter jurisdiction over the instant matter.

Whether the tribe holds aboriginal title to Westwoods is "an important issue of federal law that sensibly belongs in federal court." *Id.*at 315. The issue of aboriginal title and therefore the propriety of state and local regulation over that land "appears to be the only legal or factual issue contested in the case." *Id.* There is also an important and historic interest in providing Indian tribes with a federal forum for adjudicating their land disputes with states, and the risk that recognizing federal jurisdiction over this case will open the floodgates for cases involving state casino permitting disputes is minimal at best. *See id.* In sum, whether Westwoods is Indian land is an important national issue that has historically and routinely been resolved by federal courts and is a question that must be resolved before reaching all other aspects of the state's case. *See generally McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 168-69 (1973) (emphasis added) ("'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.'" *Rice v. Olson*, 324 U.S. 786, 789 (1945)). "This policy was first articulated by this Court 141 years ago when Mr. Chief Justice Marshall held that Indian nations were 'distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied [sic] by the United States.'" *McClanahan*, 411 U.S. 164 at 168 (citing Worcester *v. Georgia*, 6 Pet. 515, 557 (1832)). Because "there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart" of this case, *Grable*, 545 U.S. at 319-20, I would hold that federal question subject matter jurisdiction exists and that the case may not be dismissed on that basis.

8

## B. Tribal Sovereign Immunity

Having found subject matter jurisdiction, the next issue to decide is whether the Tribe enjoys tribal sovereign immunity from suit. The Tribe asserts it is immune from these consolidated actions on that basis and that tribes generally enjoy sovereign immunity from suit in all cases unless Congress or the tribe waives such immunity.

The Tribe's understanding and interpretation of tribal sovereign immunity is wholly derived from the Supreme Court's decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751 (1998). It is from *Kiowa* that Indian law jurisprudence has derived the dual propositions that, first, there is a distinction between a tribe's sovereign authority over its tribal lands on the one hand and tribal sovereign immunity *from suit* on the other and, second, that congressional or tribal waiver is *always* necessary to defeat such tribal immunity from suit. While these propositions have gained some traction, it is important to note the holding in *Kiowa* is actually narrower than its legacy would suggest: "Tribes enjoy immunity from suits *on contracts*, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." *Id.* at 760 (emphasis added). Indeed this pronouncement in *Kiowa* on the scope of tribal sovereign immunity, as applied to the particular facts at issue in that case, refers only to cases involving *contractual* disputes. There is nothing in the factual record of *Kiowa* that would require the holding be extended to suits by states seeking prospective relief against a tribe. Moreover, at least one of our sister circuits has held, to that same effect, that tribal sovereign immunity as set forth in *Kiowa* does not apply to suits seeking injunctive relief against the tribe. *TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 680-81 (5th Cir. 1999) (distinguishing *Kiowa* as a suit for money damages and holding that tribal sovereign immunity did not extend to suits for prospective relief); *see also Comstock Oil & Gas*

9

*v. Alabama & Coushatta Indian Tribes of Texas*, 261 F.3d 567, 571-72 (5th Cir. 2001) (reaffirming that in the Fifth Circuit tribes are not entitled to sovereign immunity from claims seeking prospective relief).

While it would be tempting to halt the analysis of *Kiowa* and tribal sovereign immunity at this juncture, follow the sound rationale of the Fifth Circuit in *TTEA*, and declare that tribal sovereign immunity does not bar New York's suit seeking prospective relief against the tribe for commercial activities occurring in violation of state regulations on non-Indian land,[5] the more expansive language in *Kiowa* purports to extend the scope of tribal sovereign immunity farther. Whether *Kiowa* actually supports the tribe's proposition that there is tribal sovereign immunity from the relief New York seeks in this case thus warrants further discussion.

Prior to *Kiowa*, tribal sovereign immunity, and the attendant need for congressional or tribal waiver in order to overcome it, depended on the answers to the following questions: (1) whether the tribal conduct at issue involved self-governmental or commercial activities; and (2) if the conduct involved commercial activities, whether those activities were occurring on or off the tribe's reservation. *Mescalero Apache Tribe v. Jones ("Mescalero")*, 411 U.S. 145, 148 (1973). If the tribe's activities involved either (a) matters of self-government, whether occurring on- or off-reservation or (b) on-reservation commercial conduct, then congressional or tribal waiver of tribal sovereign immunity was necessary to be able to assert regulatory control over and to pursue an action against the tribe with respect to that activity. *Id.* at 148. If, however, the tribe engaged in off-reservation commercial activities, then a state had the authority to enforce its laws against a tribe operating outside the boundaries of its reservations for all purposes unless Congress "expressly forbade it." *Id.* at 148-51.

_____

[5] Based on the district court's well-reasoned and sound opinion, I would affirm the district court's decision that the Tribe's aboriginal title was extinguished and therefore Westwoods is no longer "Indian land."

10

This framework governed questions of tribal sovereign immunity until the Supreme Court's issued its decision in *Kiowa* in 1998. *Kiowa* involved a dispute between the Kiowa Tribe of Oklahoma and Manufacturing Technologies, Inc., which had loaned the tribe $285,000. 523 U.S. at 753. The tribe subsequently defaulted on the promissory note, which expressly recited it had been signed on tribal land. *Id.* at 753-54. When the company sued the tribe in state court for breach of contract, the tribe moved to dismiss for lack of jurisdiction on the ground of tribal sovereign immunity. *Id.* at 754. The Oklahoma state courts held that the tribe was subject to suit in state court for breach of contract involving off-reservation commercial conduct. *Id.* The U.S. Supreme Court reversed, holding the tribe was protected from suit as a result of tribal sovereign immunity. *Id.* at 760. In reviewing the scope of tribal sovereign immunity, the Supreme Court noted that "tribal immunity extends beyond what is needed to safeguard tribal self-governance" and declined to confine tribal sovereign immunity to "reservations or to noncommercial activities." *Id.* at 758. Sovereign immunity thus protected the tribe from the breach of contract suit. It is worth noting that in *Kiowa* the language of the promissory note stated that "[n]othing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma," indicating the lender was on notice that the tribe had a potential sovereign immunity defense and still did not see fit to negotiate to have that reservation of immunity removed from the language of the contract. As the lender was the one disbursing the funds and was therefore in presumptive control of the contractual terms, it is not difficult to understand why the Court was inclined to hold the lender to the terms of the contract.

Before reaching its holding, however, *Kiowa* unnecessarily split its analysis of tribal sovereign immunity into two separate concepts—tribal sovereign immunity *from suit* and tribal sovereign immunity from state oversight more generally. That is, "[t]o say substantive state

11

laws apply to off-reservation conduct . . . is not to say that a tribe no longer enjoys immunity *from suit. . ..* There is a difference between the right to demand compliance with state laws and the means available to enforce them." *Id.*at 755. The Court further stated that this immunity from suit always required congressional abrogation or tribal waiver. *Id.* at 760. That legacy lives on as demonstrated by this circuit's now-vacated decision in *Oneida Indian Nation of New York v. Madison Cnty., New York*, 605 F.3d 149, 156 (2d Cir. 2010) (noting the existence of "two distinct doctrines: tribal sovereign authority over reservation lands and tribal immunity from suit") *vacated by Madison Cnty., New York v. Oneida Indian Nation of New York*, 131 S. Ct. 704 (2011), *remanded to Oneida Indian Nation of New York v. Madison Cnty.*, 665 F.3d 408 (2d Cir. 2011). As explained in more detail below, it was not necessary to the outcome reached in *Kiowa* to split the concept of general tribal sovereign immunity from the concept of tribal sovereign immunity from suit. The holding that the tribe in *Kiowa* enjoyed immunity from a suit seeking money damages arising from breach of a contract that had been executed on tribal land, i.e., commercial activity occurring on tribal land, did not depend to any degree on having to draw a distinction between general tribal sovereign immunity and immunity from suit.

Simply put, *Kiowa*'s cleaving of tribal sovereign immunity was a departure from previous precedents, which had not split the concept of tribal sovereign immunity into two parts. More specifically, the precedents upon which *Kiowa* purported to rely do not support the notion that tribal immunity from suit is distinct from tribal sovereign authority over its lands and people. Furthermore, this cleaving of tribal sovereign immunity went beyond what was necessary for the Court to reach the holding it did in *Kiowa*. And so, the legacy of *Kiowa* is at once both unnecessary dictum and without sound support in prior precedents.

Turning to *Kiowa*, the Court stated first that an Indian tribe is subject to suit only if it has waived its immunity or Congress has authorized the suit, citing *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 890 (1986); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); and *United States v. United States Fidelity & Guaranty ("USF&G")*, 309 U.S. 506, 512 (1940). *Kiowa*, 523 U.S. at 754. In those three particular cases, however, congressional or tribal waiver was necessary because the conduct at issue in each case involved matters of tribal self-governance over either its tribal members or its tribal land. In other words, by their very nature the cases cited do not support the proposition that such waiver or congressional authorization was necessary in *every* case involving an Indian tribe because those three cases involved only issues of self-governance and did not involve circumstances where the tribe's commercial activities were occurring off-reservation.

*USF&G* involved an effort by the United States, on behalf of two Indian tribes, to collect royalties from a mining company pursuant to a lease between the tribes and a mining company that permitted coal mining *on tribal lands*. 309 U.S. at 510. When the mining company declared bankruptcy, it went on to claim back against the tribes for credits exceeding the value of the royalties. *Id.* The issue was whether the bankruptcy court had jurisdiction to hear that cross-claim against the tribes because, although Congress had waived the tribe's immunity for claims arising out of the leases, that waiver was limited to suits brought in "any United States court in the Indian Territory," a waiver that did not encompass the bankruptcy court hearing the cross-claim. *Id.* at 513. The Court held that the tribe's immunity was intact and barred the mining company's claim, noting that "[t]he sovereignty possessing immunity should not be compelled to defend against cross-actions away from its own territory or in courts, not of its own choice, merely because the debtor was unavailable except outside the jurisdiction of the sovereign's

13

consent." *Id.* In other words, finding no congressional waiver permitting suit against the tribe in that particular court for disputes arising out of the lease—that is, for activities which were occurring on tribal lands—the Court held that the tribe retained its sovereign immunity and acted to bar the claim. *Id.* at 515.

In *Santa Clara Pueblo*, a female member of the tribe sought injunctive and declaratory relief against enforcement of a *tribal ordinance* denying tribal membership to the children of female members who married outside the tribe while extending tribal membership to children of male members who married outside the tribe. 436 U.S. at 51. Noting the tribe's sovereignty in matters of "self-government," which provided the tribe with the authority to regulate their "internal and social relations" free from outside influence, *id.* at 55 (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)), the Court reasoned that where the subject matter at issue involved aspects of the tribe's internal self-government, the tribe had sovereign immunity from suit absent a waiver of such immunity by the tribe or Congress, *id.* at 58. Finding no such waiver, the Court held that the suit was barred by tribal sovereign immunity. *Id.* at 72.

In *Three Affiliated Tribes*, the underlying dispute involved the tribe's attempt to sue for breach of contract and negligence in state court the company that had constructed a water-supply system on the tribe's reservation. 476 U.S. at 878. The Supreme Court addressed the issue of whether the state of North Dakota could condition the tribe's right to seek relief in state court for that dispute on the tribe's agreeing to waive immunity from *all* civil suits against it and to have any civil suit brought in state court adjudicated under state law, not tribal law. *Id.* North Dakota maintained that the tribe could access the state court system only by first agreeing to the blanket waiver of immunity and to having its tribal laws regarding marriage, divorce, child custody, and the like, preempted by analogous state laws. *Id.* at 889 ("The North Dakota jurisdictional

14

scheme requires the Tribe to accept a potentially severe intrusion on the *Indians' ability to govern themselves* according to their own laws in order to regain their access to the state courts.") (emphasis added).  The Court concluded that the requirement that the tribe submit to state oversight "even in cases that arise on the reservation, that involve only Indians, and that concern subjects which are within the jurisdiction of the tribal court" contradicted traditional notions of Indian sovereignty, noting that "'[a] tribe's power to prescribe the conduct of tribal members has never been doubted, and our cases establish that absent governing Acts of Congress, a State may not act in a manner that infringes on the right of *reservation Indians to make their own laws and be ruled by them*.'" *Id.* at 890 (emphasis added) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) (internal quotation marks and alterations omitted)).

These three cases on which *Kiowa* relied to pronounce broadly that congressional or tribal waiver is always necessary each involved attempts to impede or infringe on the tribes' privileges of self-government over its tribal members or involved commercial activities occurring on tribal land.  And while the issue of tribal or congressional waiver would necessarily arise under such circumstances, it does not follow that such a waiver is required in other contexts where the tribe could not reasonably be said to be exercising any "sovereign authority," i.e., outside the boundaries of its tribal lands in matters not involving issues of internal tribal self-governance.

In stating that "our cases have sustained tribal sovereign immunity from suit without drawing a distinction based on where the tribal activities occurred," 523 U.S. at 754, *Kiowa* also did not credit those locational factors bearing on the Court's analyses in its earlier cases.  The only case it cited for this latter proposition is *Puyallap Tribe, Inc. v. Department of Game of the*

15

*State of Washington ("Puyallap III")*, 433 U.S. 165 (1977). That case, which at that time was well into its second decade and had already been heard before the Supreme Court twice, involved Washington State's attempts to regulate the fishing activities of tribal members along the Puyallap River. In *Puyallap Tribe v. Department of Game of Washington ("Puyallap I")*, 391 U.S. 392, 398, 400-01 (1968), the Supreme Court held that a treaty guaranteeing the *right* of tribe members to fish on- and off-reservation did not foreclose the state's ability to *regulate* such fishing, on- and off-reservation, for conservation purposes. Of significance to the issue of tribal sovereign immunity, the *Puyallap I* Court characterized the suit as "a suit to enjoin violations of state law by individual tribal members fishing off the reservation," a characterization that did not implicate issues of the tribe's sovereign immunity. *Id.* at 396 n.11. The case was remanded to the state court to determine whether the state's total ban on net fishing was a necessary conservation measure. *Id.* at 401-02. In *Washington Game Department v. Puyallap Tribe ("Puyallap II")*, 414 U.S. 44, 48-49 (1973), the Supreme Court reversed the state court's decision upholding the ban on net fishing and remanded to establish a fair fishing quota between Indian net fishing and non-Indian sport fishing; the issue of tribal sovereign immunity, however, was not addressed.

*Puyallap III* involved a challenge to the state court's order regarding the number of trout the tribal members could catch with nets. 433 U.S. at 167. In that order, the state court said it had "jurisdiction to regulate the fishing activities of the Tribe both on and off its reservation" and to set the number of fish that the tribe could catch with nets each year. The state court directed the tribe "to file a list of members authorized to exercise treaty fishing rights" and to report the number of trout caught each week to the state's Department of Game and the court. *Id.* On appeal to the Supreme Court, the tribe objected to the order, arguing that "the state courts

16

of Washington [were] without jurisdiction to regulate fishing activities *on its reservation*." *Id.* (emphasis added). The Supreme Court held that the tribe's sovereign immunity barred the state court's exercise of jurisdiction over the tribe absent waiver or consent from the tribe or Congress. *Id.* at 172-73. The Court concluded, however, that the state court *did* have jurisdiction over the individual tribal member defendants to "decide questions relating to the allocation between the hatchery fish and the natural run, the size of the catch the tribal members may take in their nets, their right to participate in hook-and-line fishing without paying state license fees and without having fish so caught diminish the size of their allowable net catch, and like questions," both on and off the reservation. *Id.* at 173. In other words, while the state could regulate individual members of the tribe, tribal sovereign immunity precluded the state court from ordering the tribe to report to the state: (a) which members of its tribe were authorized to exercise the treaty fishing rights and (b) the weekly catch amounts of its tribal members. *Id.* at 178. Problematically, the state court's order had sanctioned state interference with the tribe's relationship and oversight of its members. *Puyallap III*, therefore, does not support *Kiowa*'s blanket proposition that tribes enjoy immunity from suit "without drawing a distinction based on where the *tribal* activities occurred." 523 U.S. at 574 (emphasis added). Rather *Puyallap III*, in line with the other precedents discussed above, at most held the state had no authority, absent congressional or tribal waiver, to direct the tribe's oversight of tribal members, i.e., to interfere with the tribe's right of self-governance.

Citing *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma ("Potawatomi")*, 498 U.S. 505 (1991), and *USF&G*, 309 U.S. 506, *Kiowa* stated that the Court had never "drawn a distinction between governmental and commercial activities of a tribe" when determining whether the tribe had sovereign immunity from suit. 523 U.S. at 754-

17

55. Although it is correct that in *Potawatomi* and *USF&G* the tribes engaged in commercial activities and non-governmental activities, *Kiowa* overlooked the salient point of those cases—that the commercial activities in each case were *occurring on the reservation*. In *USF&G*, 309 U.S. at 510, the tribe had leased out its *tribal* land for coal mining activities, and in *Potawatomi*, 498 U.S. at 507, the tribe was selling cigarettes on *tribal* land.

Ignoring that *Puyallap III* involved interference with the tribe's prerogative of self-governance and that *USF&G* and *Potawatomi* involved on-reservation commercial activities, *Kiowa* stated incorrectly that "[t]hough respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions." 523 U.S. at 755. In fact, the very precedents on which *Kiowa* relied yield the following formulation for the applicability of tribal sovereign immunity: tribal sovereign immunity, and the attendant need for congressional or tribal waiver in order to overcome it, applies in cases involving (1) interference with matters of tribal self-governance, whether on- or off-reservation (*Santa Clara Pueblo*, *Three Affiliated Tribes*, and *Puyallap III*), or (2) commercial activities occurring on-reservation (*USF&G* and *Potawatomi*).

That leads to an analysis of the final category of cases, i.e., those involving off-reservation commercial activities. As set forth in *Mescalero*, 411 U.S. at 148-49, which affirmed the state's right to collect taxes on a tribe's activities at its off-reservation commercial ski resort, "absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." Here as well, *Kiowa* mixed and matched the pertinent precedent, cleaving the notion of tribal sovereign immunity into two separate concepts. *Kiowa* acknowledged that "[w]e have recognized that a State may have authority to tax or regulate tribal activities occurring within the

18

State but outside Indian country." 523 U.S. at 755 (citing *Mescalero*, 411 U.S. at 148-49 and *Organized Village of Kake v. Egan*, 369 U.S. 60, 75 (1962) (declaring that "State authority over Indians is yet more extensive over activities . . . not on any reservation")). But at odds with both *Mescalareo* and *Potawatomi*, the *Kiowa* court then concluded that "[t]o say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit." 523 U.S. at 755 (citing *Potawatomi*, 498 U.S. at 510).

In *Mescalero*, the tribe operated an off-reservation ski resort in New Mexico. 411 U.S. at 146 ("[N]o part of the enterprise, its buildings or equipment is located within the existing boundaries of the reservation."). The state then asserted its right to impose a tax on the ski resort's gross receipts and to impose a use tax on certain ski lift equipment purchased outside the state and used in connection with operating the resort. *Id.* In seeking a refund on the tax it had already paid and in protesting the state's use tax assessment, the tribe argued that the ski resort's income and property were not subject to state taxation. *Id.* The land itself, having been acquired through a congressional act, was exempt from state property tax; the issue, however, was whether that property tax exemption extended to the use of the land. *Id.* at 155. Drawing a distinction between states' efforts to enforce revenue laws against on- and off-reservation tribal enterprises, the Court noted that for *on-reservation* conduct, the state had to have "congressional consent" before it had any authority to tax "Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation." *Id.* at 148 (citing *McClanahan v. State Tax Comm'n*, 411 U.S. 164 (1973)). *Off-reservation* activities, however, were a different story. *Id.* ("[T]ribal activities conducted outside the reservation present different considerations."). Noting that state authority was "more extensive" over off-reservation tribal activities, *id.* (quoting *Organized Village of Kake*, 369 U.S. at 75), the Court held that "[a]bsent

19

express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State," *id.* at 148-49. In other words, in *Mescalero* the location of the tribe's activities was *the deciding factor* in determining the state's ability to enforce its laws against the tribe—be they tax laws or criminal laws or otherwise. *Id.* Whereas a state's ability to regulate a tribe's *on-reservation* activities depended on a congressional or tribal waiver of the tribe's sovereign immunity, for *off-reservation* activities the opposite was true, that is, a state retained its authority to regulate a tribe unless Congress "forbade it." *Id.* Finding no congressional authority exempting the tribe's off-reservation "business enterprise" activities from state taxes, the Court held that the ski resort's gross receipts were subject to state taxes.[6] *Id.* at 157-58. Specifically, the Court held that there was nothing in the statute to "bar the collection of New Mexico's nondiscriminatory gross receipts tax and that the Tribe's ski resort is subject to that tax." *Id.* At no point did the Court state, hold, or otherwise indicate that, in the future, the state of New Mexico would be prohibited from collecting the tax because the tribe enjoyed some sort of immunity *from suit*. The Court stated in *Kiowa* that "[t]o say that substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit." *Kiowa*, 523 U.S. at 755. That pronouncement, however, begs the question why the *Mescalero* Court held that New Mexico was permitted to *collect* the disputed tax. *Mescalero*, 411 U.S. at 158 ("We therefore hold that the exemption [for property taxes in the relevant statute] does not encompass *or bar the collection* of New Mexico's nondiscriminatory gross receipts tax and that the Tribe's ski resort is subject to that tax.") (emphasis added). According to *Kiowa*'s logic, the

---

[6] The Court reached the opposite conclusion with respect to the use tax imposed in connection with the construction of the ski lifts, reasoning that they were improvements to the land and thus were subject to the tax exemption that ran with the land under the statute. *Id.* at 158.

20

*Mescalero* Court should have acknowledged New Mexico's *right* to collect the tax but then prohibited the state from actually collecting the tax based on the tribe's immunity from suit moving forward. *Mescalero*, however, proceeded to the merits, and the Court held that the state was entitled to *collect* the gross receipts tax from the tribe—hardly an imprimatur for the exercise of tribal immunity from suit. *Mescalero* thus does not support *Kiowa*'s pronouncement that states cannot exercise their authority over tribe's off-reservation activities without first getting congressional or tribal waiver of immunity from suit.

*Kiowa* goes on to observe that it was not unusual for states to be left with a right but no remedy, citing *Potawatomi* for the proposition that there is a "difference between the right to demand compliance with state laws and the means available to enforce them." 523 U.S. at 755 (citing *Potawatomi*, 498 U.S. at 514). *Potawatomi*, however, involved *on-reservation* activities and thus, is not in conflict with *Mescalero*, which involved *off-reservation* activities. In *Potawatomi*, the tribe filed suit in federal court seeking an injunction against Oklahoma's efforts to collect taxes on the sale of cigarettes *on Indian land*. 498 U.S. at 507. The Court first determined that the tribe was operating its convenience store on land "that qualifie[d] as a reservation for purposes of tribal sovereign immunity." *Id.* at 511. This was an important step in the Court's analysis because, as the Court explained, there was a distinction between the extent of a state's authority depending on whether the tribal activities were occurring on- or off-reservation. The Court noted, regarding on-reservation activities, that Congress had never authorized suits to enforce tax assessments. *Id.* at 510. Regarding off-reservation activities, however, the Court reiterated the holding from *Mescalero* that "'absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.'" *Id.* at 511

(quoting *Mescalero*, 411 U.S. at 148-49). Because the activities at issue in *Potawatomi* were occurring on the reservation, and given the lack of congressional or tribal waiver, the tribe's sovereign immunity barred the tax assessment suit. *Id.*

The confusion regarding *Potawatomi* arises because the Court in *Potawatomi* further held that tribal sovereign immunity did not excuse the Potawatomi tribe from "all obligations to assist in the collection of validly imposed state sales taxes," which included sales to nonmembers of the tribe. *Id.* at 512. According to the *Potawatomi* Court, 498 U.S. at 513, that obligation derived from two prior Supreme Court cases—*Washington v. Confederated Tribes of Colville ("Colville")*, 447 U.S. 134 (1980), and *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463 (1976). "[*Colville* and *Moe*] stand for the proposition that the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the tribe." 498 U.S. at 513. Thus, in *Potawatomi*, while the tribe was entitled to sovereign immunity from suit *because of where its activities were occurring*, that sovereign immunity did not technically absolve the tribe from its obligation, established in prior Supreme Court cases, to collect sales taxes from nonmembers. *Id.* Oklahoma was left, therefore, with a right without a remedy because the cigarette sales to nonmembers were occurring on tribal land. That is, the tribe's sovereign immunity from suit ran with the land. On its facts, therefore, *Potawatomi* does not support the proposition that there is separate "immunity from suit" that exists beyond the boundaries of the tribe's reservation and that is separate and apart from the tribe's traditional sovereign immunity which derives from the sovereignty it maintains over its tribal lands. *Kiowa*, 523 U.S. at 755 (citing *Potawatomi*, 411 U.S. at 510, 514, when stating "[t]here is a

22

difference between the right to demand compliance with state laws and the means available to enforce them").

In sum, prior to *Kiowa*, it could be fairly said that, unless Congress dictated otherwise, a state could enforce its non-discriminatory laws against tribal activities occurring beyond the bounds of the reservation, so long as such activities were not intimately related to tribal self-governance. If, on the other hand, the state or a private party sought to enforce its laws or contractual rights on tribal lands, it needed to have congressional or tribal waiver of sovereign immunity. *Kiowa*, limited to the facts on which its holding rests, is not to the contrary: the party that sought to enforce a contract—that arguably involved on-reservation conduct because it was executed on the reservation—was barred from suing the tribe for breach of contract because the tribe had not waived its tribal sovereign immunity. *Id.* at 760. *Kiowa*'s broader sweeping pronouncements beyond those necessary to resolve the issue in dispute in that case—i.e., that a tribe's sovereign immunity from suit is a separate concept from general sovereign immunity over a tribe's lands and issues of self-governance and that the only way to overcome this distinct type of sovereign immunity from suit is to obtain congressional or tribal waiver—were unnecessary to the Court's holding. In a word, they are dicta.

In the case before us, the state and the town are seeking to enforce their laws against the tribe's off-reservation commercial activities. For the plaintiffs to be able to do so, there is no need for a congressional or tribal waiver of sovereign immunity. As the tribe has not shown and cannot show that Congress has expressly forbidden the exercise of state and local authority at issue here, in my view tribal sovereign immunity does not bar the instant actions against the tribe.

## C. The Merits

Having concluded that there is federal question subject matter jurisdiction and that the Tribe is not entitled to tribal sovereign immunity from suit in this case, I would affirm the district court's well-supported analysis concluding that the historical record demonstrates the Tribe's aboriginal title to Westwoods was extinguished in the 17th century and that, in the absence of aboriginal title, the Tribe is subject to the application of state and local laws. *Shinnecock*, 523 F. Supp. at 188-89. Accordingly, I would affirm the district court's grant of a permanent injunction barring the Tribe from constructing a casino on the Westwoods parcel not in compliance with state and local laws and regulations. *Id.* at 190.